**John W. CLAYBAUGH, Plaintiff,**

v.

**PACIFIC NORTHWEST BELL TELE-
PHONE COMPANY, a Washington
corporation, Defendant.**

**Civ. No. 71-805.**

United States District Court,
D. Oregon.

March 2, 1973.

Keith Burns, Jane Edwards, Portland,
Or., for plaintiff.

James Rogers, Davis, Biggs, Strayer,
Stoel & Boley, Portland, Or., for defend-
ant.

## OPINION

BURNS, Judge:

Which are to be accommodated—
Plaintiff-employee's religious needs or
Defendant-employer's business needs?
That, broadly stated, is the issue in this
case. Narrowly stated, the issue is

whether Defendant, Pacific Northwest Bell (Bell) in discharging Plaintiff, John Claybaugh (Claybaugh), complied with the requirements of the Equal Employment Opportunity Act of 1964.[1] The answer to this, in turn, depends upon whether Bell met its obligation ". . . to make reasonable accommodations to the religious needs of employees . . . where such accommodations can be made without undue hardship on the conduct of the employer's business."[2]

The outcome of a dispute such as this necessarily depends upon an analysis of the unique facts of this case. However, the lack of authoritative precedent in this sensitive field of law, the small but significant number of such cases which continue to arise, and the delicacy of the task faced by employers in striking a balance between religious needs of their employees and their own business needs, call for an opinion of perhaps greater length than might otherwise be appropriate. What follows are my findings and conclusions pursuant to Rule 52, F. R.Civ.P.

## I. THE FACTS:

The facts in this case are largely undisputed. Claybaugh first became a Bell employee in 1965 as a lineman at Eugene, Oregon. At that time he specifically advised Bell he had no objection to working "Saturday, Sunday, holidays, or day, evening or night hours." In August of 1967 Claybaugh was transferred to Bell's operation at Adair Air Force Base near Corvallis as a transmission man. In 1969 Bell was phasing out its Adair operation; pursuant to its policy of attempting to relocate employees, Claybaugh was given the opportunity to choose between Madras, Astoria or Klamath Falls, the latter being selected by Claybaugh. At that time, September 1969, Claybaugh was aware that if he had chosen either Madras or Astoria it would have been a five-day work week, Monday through Friday (day shift) only. He was equally aware that the

Klamath Falls' operation was a round-the-clock, seven-days-a-week installation in which all employees would be expected to work nights and/or weekends from time to time.

While in Corvallis, Claybaugh had become interested in joining the Seventh Day Adventist Faith (Church) which observes its Sabbath from sundown Friday until sundown Saturday. However, he was not yet committed to joining the Church when he transferred to Klamath Falls.

It is unquestioned that in Klamath Falls Bell must provide round-the-clock service. This is not only for the residential and business customers in the area, but also specifically for the Air Force Base located near Klamath Falls. There must always be at least one transmission man on duty to insure that transmission difficulties which may arise may be attended to and corrected promptly.

In its Klamath Falls' operation Bell has nine transmission men. The crews work three shifts: the evening shift, from 4:00 P.M. to midnight; the night shift, from midnight to 8:00 A.M.; and the day shift, from 8:00 A.M. to 4:00 P.M. Customarily one transmission man was on duty on each of the evening and night shifts. A crew of three or more were on duty on the day shift during the week. On Saturday and Sunday, usually only one person was on duty during the day shift.

When Claybaugh first commenced his duties at Klamath Falls in September 1969 he was assigned to the day shift for his initial orientation period so as to familiarize himself with the office equipment and practices of that particular location. After about a month and a half of orientation, in early November 1969 he was assigned to the night shift. Claybaugh was then the least senior man in Klamath Falls and was required, under local practice, to take what was regarded as the least desirable shift. He

1. 42 U.S.C. § 2000e, et seq.

2. 29 C.F.R. § 1605.1(b).

worked the night shift until October 1970, when he was transferred to the day shift. He worked the day shift continuously until his discharge in October 1971.

Scheduling for the Klamath Falls operation had the day shift men working, as a regular routine, five days in a row, then two days off. The evening and night shift personnel would normally work ten days in a row, and then have four days off. This apparently was the procedure which had evolved to minimize both scheduling difficulties and expenditures for premium or overtime pay. To meet the requirement of having personnel on duty at all times, when a man had one or more shifts off, another member of the crew was scheduled in his place. Usually, when an evening or night man was off, a day shift man was scheduled in his place.

The contract between Bell and the union provided that whenever a person worked a shift other than the one to which he was regularly assigned, he would draw premium or overtime pay of time-and-a-half. In addition, all Sunday work by union contract was at premium pay scale of time-and-a-half. Also, as a result of the union contract, Bell was required to schedule the men so as to roughly equalize the amount of premium or overtime pay that any given employee would receive. In other words, the employee who had accumulated the least amount of overtime at a given moment of scheduling preparation would be scheduled into the next overtime opportunity; that is, he would be scheduled into a non-assigned shift ahead of the other members of the crew. As a result, over a period of a year's time there would be a constant shifting of accumulated overtime. This overtime equalization requirement is one of the factors which inhibits the permanent assignment of any single given employee at Klamath Falls on a straight Monday through Friday day shift.

Around June 1970 Claybaugh's religious beliefs ripened to the point where he decided to join the Church. He sought to determine whether he could be relieved of the overtime assignments which required him to work during the period between sundown Friday and sundown Saturday. There are four shifts which exist during Claybaugh's Sabbath and which adoption of his new faith would compel him to avoid. These consist of the Friday evening shift from 4:00 P.M. to midnight; the Saturday night shift from midnight Friday until 8:00 A.M. Saturday; the Saturday day shift from 8:00 A.M. to 4:00 P.M.; and, the Saturday evening shift from 4:00 P.M. to midnight. As to the Saturday evening shifts, the portions of these shifts which would interfere with Claybaugh's Sabbath varied with the time of the year. In the winter months, the sun set at the earliest at 4:39. In the summer, when Daylight-Saving Time was in effect, the sun set as late as 8:52.

In any event, in early June 1970 Claybaugh discussed this problem with his superior and sought relief. Shortly after this initial discussion he delivered a letter to Mr. Hanson, the chief transmission man in the Klamath Falls operation.[3] About a week later he was called into a conference with Mr. Hanson and the plant manager, Mr. Hinsworth. He was told that Bell could not comply with his request. If he wished

---

3. "At this time I am submitting to you a formal request to be taken off the overtime list as required by the Overtime Administration Practices of the Pacific Northwest Bell (Oregon Area) and O.R.T.T. Contract. It is my wish to be relieved of overtime participation not specifically for overtime purposes but so that I may have Saturdays and Sundays off. I would like to have Saturdays off for Sabbath keeping purposes of the Seventh Day Adventist Church. It is my desire to join this church in the future, and it would be impossible to do so without having Saturdays off.

"It is not my wish to cause any hard feelings or extra burden on you or any of my associates because of this request.

"I am hopeful that you will give this request every consideration.

Respectfully,
/s/ John W. Claybaugh"

to keep his job, he would have to hold himself in readiness for regular assignments, including those which might fall during his Sabbath.

While Claybaugh did not formally join the Church, nonetheless Bell was aware of his continuing request for a solution. This uneasy state continued for nearly a year and a half. The subject was discussed from time to time amongst the employees. Consideration was given by Mr. Hinsworth, as well as by his superiors throughout the Bell hierarchy. According to the evidence, this request was carefully studied by various echelons in Bell up to and including the vice-presidential level in Seattle. While the study was careful and conscientious, the evidence is clear that nothing but study occurred.

The matter came to a head in September 1971, when Claybaugh sent another written request for Sabbath work exemption to Mr. Hanson.[4] On Thursday, October 7, 1971, in another meeting with his superiors, he was again told that his request could not be granted, and that if he did not work all of his scheduled evening shift Friday, October 8th, and his scheduled evening shift Saturday, October 9th, his employment would be terminated. He did not complete the Friday shift but instead departed his duties at about 5:30 P.M. on Friday; when he reported Saturday at about 6:40 P.M. for the shift which had started at 4:00 P.M., he was called and told he was terminated.

Claybaugh had commenced the exercise of his administrative remedies in June 1970 by filing a complaint with the Civil Rights Division of the State Bureau of Labor.[5] In September 1970 that agency terminated its investigation, finding no probable cause for a civil rights violation. The Federal Equal Employment Opportunity Commission (EEOC) assumed jurisdiction in September 1970 and thereafter found that reasonable cause existed to believe that Bell had not complied with the Act. Pursuant to the Act, EEOC sent Claybaugh a "notice of right to sue within thirty days." Thereafter, Claybaugh timely commenced this action.

Following his discharge, Claybaugh obtained employment in December 1971 with the Beaver State Telephone Co. in Lakeview as an equipment man. He has been continuously employed by Beaver since.

It is agreed that Claybaugh was an excellent employee. He fulfilled his duties well and Bell agrees that his religious beliefs at all material times have been sincere. The evidence at the trial showed that he had, in fact, become a formal member of the Church on about the 15th day of January, 1972, having refrained from formal joining of the Church hoping this matter could be amicably settled in a manner which would allow him to retain his employment with Bell and still observe his new Sabbath.

## II. THE LAW:

An employer has an obligation ". . . to *make* reasonable accommodations to the religious needs of employees . . . where such accommodations can be made without undue hardship on the conduct of the employ-

---

4. "This to confirm in writing our conversation of September 29, 1971.
   "My conscience will no longer allow me to work on the Lord's Sabbath. It is my desire to keep the Lord's Sabbath and in doing so I will be unable to work from Friday evening sundown until after sundown on Saturday.
   "It is my hope that you will be able to change my schedule so that I may be able to have this time off. As I have stated before on many occasions I would be willing to work any kind of schedule that would allow me this time off. If it is not possible to reschedule my Friday evening and Saturday work, I am wondering if another job in the Klanath (sic) Falls plant department might be available so that my request for Sabbath off could be granted?
   "As of this date September 29, 1971 I will no longer work on the Sabbath.
   "/s/ John W. Claybaugh"

5. O.R.S. 659.040.

er's business." (emphasis added).[6] "Because of the particularly sensitive nature of discharging . . . an employee . . . on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."[7] The conduct of Bell as presented by the evidence exemplifies what both Congress and the EEOC intended to prevent. This guideline by its very language places an *affirmative duty* upon an employer to attempt an accommodation. Bell took no such affirmative action even though there were various alternatives available.

Bell could have made temporary accommodations as it had done at other installations. Bell either by full scheduling or by allowing employees to come in late or leave early had met other employees' needs. These accommodations were for such purposes as Toastmaster meetings, Boy Scout meetings, bowling teams, and attendance by employees at Oregon State University.[8]

■ At all relevant times, Bell contended there was no way on a permanent basis that it could omit scheduling Claybaugh for some required duty during his Sabbath. This conclusion by Bell was reached by looking at the schedule and determining the changes were insur-

mountable.[9] Bell took no affirmative action whatsoever. A temporary accommodation such as Bell's asking that its employees exchange shifts or even a temporary readjustment would have allowed Bell to take a less drastic step than discharging Claybaugh. The burden is on the employer and not the employee asking for an accommodation to seek out the cooperation of other employees if, as here, this would be a reasonable accommodation.

At the heart of possible temporary or permanent accommodations is Claybaugh's willingness to take another job with Bell in Klamath Falls or elsewhere. This willingness to take another job so as to be accommodated is evidenced by Claybaugh's final letter set forth in Footnote 4.[10] There is no requirement for an employer to discharge or transfer other employees to accommodate the needs of one; however, as discussed, a temporary accommodation could remedy the problem until permanent remedies were found. Bell's size as an employer defies any conclusion other than that an open position could be found within a short time where Claybaugh's religious needs could be permanently accommodated.[11] It is the employer's duty to seek out such an open position within its organization before it can discharge an employee based on religious needs.

6. 29 C.F.R. § 1605.1(b).

7. 29 C.F.R. § 1605.1(c).

Counsel agree, without waiving their respective positions, that this Court would follow the oral opinion of Chief Judge Robert C. Belloni in Daniels v. Pacific Northwest Bell Telephone Company, Civil No. 71–241 (D.C.Or., decided January 24, 1972) as to the validity of this guideline, its force and effect. *Daniels* is presently pending before the U. S. Court of Appeals for the Ninth Circuit.

*See also,* Reid v. Memphis Publishing Company, 468 F.2d 346 (6th Cir., 1972); and Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir., 1972).

8. The evidence is clear that at least during the winter months where on the Saturday evening shift an hour or less of post-sundown time was involved, Bell could have accommodated Claybaugh as it ac-

commodated other employees for these other activities.

9. It should be noted that in the 12 months preceding his discharge, Claybaugh was only scheduled for 15 shifts which would conflict with the observance of his Sabbath.

10. I disagree with Bell's interpretation of this letter as an ultimatum. The evidence introduced at trial shows that Claybaugh was willing to move from Klamath Falls to take a job where his religious needs would be accommodated. This letter does not make this clear. However, if Bell had attempted to make an accommodation through a transfer, or even approached Claybaugh with this alternative, it would have learned of this willingness.

11. Bell employs 150 toll transmission men in Oregon.

**6**

It is clear that Claybaugh was aware of the importance of his position and the need to do emergency repairs on the equipment from time to time. Bell was aware that he was willing to work any "emergency" on the Sabbath. He was willing to be bound by the definition of an emergency as made by a superior.[12]

Another alternative that was not explored by Bell was union cooperation in solving this problem which affects both organizations. It is odd that insofar as the alleged scheduling problems were based on contract requirements for the allocation of overtime, Bell did not see fit to formally consult union representatives and attempt to work out either temporary or permanent accommodations. Again, it is the employer's burden to seek union assistance, not the employee's.

■ Bell's overall position seems to be that so long as it studied a situation and in good faith believed that scheduling difficulties prevented a permanent scheduling solution to accommodate Claybaugh's religious needs, a discharge of Claybaugh would be lawful. I do not agree. This is not the *"making"* of a reasonable accommodation. The fact that an employer's motives were pure does not obviate the illegality of a discharge. While there is no question but that Bell thought it had complied with the Act, nonetheless, as Chief Justice Burger stated, "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." (emphasis by the Court)[13].

The requirement upon an employer to make a reasonable accommodation to the religious needs of an employee is not unbending. However, an employer cannot sustain its burden of showing undue hardship without first showing that it made an accommodation as an attempted remedy. As the degree of business hardship increases, the quantity of conduct which will satisfy the reasonable accommodation requirement decreases. The balancing of reasonableness and hardship is what I believe Chief Justice Burger was referring to as the "business necessity"[14] which would qualify as a legitimate reason for discharging an employee.

Obviously, in the case where an employer maintains a one-man crew and specially hires the man for Saturday and Sunday work, there would be no way for the employer to accommodate such a person if his beliefs were similar to Claybaugh's. However, with a larger crew, scheduling may be altered so as to accommodate religious needs of employees.

Balancing the facts of this case, the lack of any affirmative action to make an accommodation precludes the finding of an undue hardship. While I have doubts as to whether or not Bell could permanently alter its Klamath Falls schedule to accommodate Claybaugh, it is clear it could have done so on a temporary basis while exploring such avenues of accommodations as discussed. The discharge of Claybaugh was discriminatory and, therefore, illegal. The questions of an appropriate remedy, plus award of attorney's fees, remain. Oral argument on these will be scheduled by the Clerk. Following such hearing, an appropriate judgment order will be entered.

---

12. Bell contends that there existed a "Bona Fide Occupational Qualification" to always be available for work. I do not agree. This exception is to be narrowly construed and has no applicability to the facts of this case. *See*, Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228 (5th Cir., 1969).

13. Griggs v. Duke Power Company, 401 U.S. 424, 432, 91 S.Ct. 849, 853, 28 L.Ed. 2d 158 (1971).

14. *See*, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d 158.