**Howard DIXON, Jr., Plaintiff,**

v.

**OMAHA PUBLIC POWER DISTRICT, Defendant.**

**Civ. No. 73-0-361.**

United States District Court,
D. Nebraska.

Oct. 30, 1974.

---

from alleged religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended. Plaintiff alleges that his job transfer, as hereafter explained, because of his refusal to work from sundown Friday to sundown Saturday each week, pursuant to his religious belief and his understanding of the tenets of his religion, constituted a violation of the Civil Rights Act. Plaintiff at all times material hereto was a member of the World Wide Church of God.

This Court has jurisdiction based upon 42 U.S.C. § 2000e–5(f) and the defendant employer is subject to Title VII of the Civil Rights Act, *supra*. (Initially Lynn A. Monroe, General Manager of O.P.P.D., was a party and also the International Brotherhood of Electrical Workers, Local 763, was a party. The defendant Monroe was dismissed by agreement of the parties during trial and International Brotherhood was dismissed prior to trial upon motion of the plaintiff.) Plaintiff prays that a mandatory injunction issue reinstating him to his former position with the defendant employer including all pay increases, promotions and reinstatement of all other fringe benefits; judgment against defendant employer for plaintiff's loss of back wages, with interest; costs and attorney fees; permanent injunction restraining defendant from violating plaintiff's constitutional and lawful rights.

Verne Moore, Jr., Omaha, Neb., for plaintiff.

Hird Stryker, Omaha, Neb., for defendant.

## MEMORANDUM OPINION AS ANNOUNCED IN OPEN COURT ON OCTOBER 30, 1974

SCHATZ, District Judge.

This is an action for trial to the Court brought by an individual plaintiff against his present employer, Omaha Public Power District, seeking redress

## FINDINGS OF FACT

1) Omaha Public Power District is a public corporation and political subdivision of the State of Nebraska engaged in the generation, transmission and distribution of electrical energy to approximately 550,000 customers in eastern Nebraska. Of its fifteen hundred employees, approximately eighty are journeymen and apprentice linemen assigned to construction and maintenance of overhead transmission and distribution lines. Of these eighty people, malfunctions and outages of every kind are handled by two-man service crews consisting of a crew foreman, who is a journeyman line-

man, and an apprentice lineman, and there are but seven of such crews.

2) The service crews' work schedules provide for continuous coverage from 8 a. m. until 11:30 p. m., Monday through Saturday, and call-out services on Sundays and the night hours of 11:30 p. m. to 8 a. m. each day. These crews are rotated systematically over four- to six-month periods, and during any given week the regularly scheduled hours for not less than five of the seven crews must include hours of work at the regular rate of pay between sundown Friday and sundown Saturday. These service crews are the first line of defense of the O.P.P.D. when storms or other emergency situations impair transmission and distribution of electrical energy, and they are expected to be available and to work all overtime as is required to eliminate and remedy all emergency problems within the shortest time possible to restore electric energy to all customers of the defendant.

3) As to the service crew, when the apprentice lineman of the crew has successfully served his apprenticeship, his next promotion and the next line of progression for him is that of crew foreman of a two-man crew.

4) In January of 1970, plaintiff applied to the O.P.P.D. for employment, indicated an interest in line work, was first interviewed and given routine aptitude tests by one D. W. Fox and referred to one Mr. G. E. Dougherty, manager of the O.P.P.D. transmission and distribution center, Irvington, Nebraska. At this time, plaintiff was a member of the World Wide Church of God. After the Dougherty interview, plaintiff was hired as a candidate for the lineman apprenticeship program, which was explained to him. At that time the evidence shows that the plaintiff discussed with Mr. Dougherty the fact that there were two Mondays each year which were holy days for his religion and on which he would be unable to work, with Dougherty advising plaintiff that this should not present any particular problem. There is a conflict in the evidence whether plaintiff and Mr. Dougherty discussed the situation about plaintiff not being willing to work between sundown Friday and sundown Saturday each week.

5) Plaintiff was hired as a utility man, which is a probationary position to determine whether the employee has reasonable aptitude for lineman duties. After six months, if the employee has demonstrated such aptitude, he is then placed in the apprenticeship program which requires four years to complete and which is divided into eight six-month stages. During one of these stages, usually the last or next to last, the apprentice is assigned as a member of a service crew (two-man crew) to receive further on-the-job training. Upon successful completion of this program, the employee then becomes a journeyman lineman and a member of a service crew and his next step in the line of progression is to foreman of one of the seven service crews of the defendant.

6) In approximately October of 1971, when the plaintiff's normal progression would require his assignment to a service crew, the matter of the plaintiff's refusal to work on his Sabbath arose as a real obstacle concerning his normal progression. Up until this period, and during the previous training portion of plaintiff, the defendant had accommodated the plaintiff on one or two occasions when he had declined to work beyond his regularly scheduled hours on a Friday evening, but this had presented no undue hardship to the defendant and no real obstacle came to the fore until plaintiff's assignment to a service crew became imminent.

7) At that time there was considerable discussion between Mr. Dougherty and other supervisors of the O.P.P.D. and also between Mr. Dougherty and the plaintiff. At that time Mr. Dougherty advised the plaintiff that it was necessary that he would be expected to comply with the service crew work schedule. In that connection there is some evidence that the plaintiff could receive dispensation from his pastor for Sabbath work

but because of his own individual conscience, he chose not to do so.

8) After these various discussions, it was determined by the O.P.P.D. that no decision should be made concerning the plaintiff's situation until the O.P.P.D. was certain that plaintiff would not change his mind when the actual assignment was made to him and that any action at that time on the part of the O.P.P.D. would be premature.

9) After assignment to the service crew, plaintiff refused to report for work on regularly scheduled shifts for Saturday, November 27, 1971; Saturday, December 4, 1971; Friday, (3 p. m. to 11:30 p. m.) December 10, 1971; Saturday, December 18, 1971. After these absences, it was concluded by the O.P.P.D. that the plaintiff could not be continued for his progression of work leading to foreman of a service crew, this after another interview with plaintiff endeavoring to persuade him to change his position with reference to the Sabbath and urging him to reconsider his position, which the plaintiff declined to do. Thereupon, one of plaintiff's superiors requested that plaintiff be permitted to remain in the line department for an additional period of several weeks so that an opportunity could be made to continue a search within the O.P.P.D. for another assignment for him where his absences on the Sabbath could be accommodated.

10) After considerable search for another assignment, defendant called the plaintiff in and advised him that the best available opening was that of a utility man in the defendant's stores department and that his situation concerning the Sabbath would not present an undue hardship for his accommodation by the defendant in that particular job, although he would be the only employee in that department exempted from Saturday work. The plaintiff elected to accept this assignment.

11) At the time he was reassigned to the stores department, his rate of pay as an apprentice lineman in that program was $4.53 per hour. His initial rate as a utility man in the stores department was $3.51 per hour, and he commenced working there in January of 1972. Since that time plaintiff has received five general and scheduled wage increases and three promotions and his wage rate at the present time is $5.03 per hour. Had he remained in, and successfully completed, the apprentice lineman program, his present rate would have been $6.95 per hour.

12) At the time of trial, plaintiff was no longer a member of the World Wide Church of God in that the World Wide Church of God had "splintered" in this community and he had chosen to go with the local splinter group and disassociate himself from the national World Wide Church of God congregation. Since the local World Wide Church of God congregation does not have the strict tenets regarding working for compensation on the Sabbath, it is fair to infer from the evidence in this regard that plaintiff could now work for compensation on the Sabbath, according to his religion, if he so desired.

13) Plaintiff made appropriate complaint regarding his demotion or transfer to the State of Nebraska Equal Opportunity Commission, pursuant to the Nebraska Fair Employment Practice Act, and the rules and regulations of the Equal Opportunity Commission, State of Nebraska. The Commission found against plaintiff and dismissed his complaint and after appropriate notification, plaintiff instituted timely action in this Court.

## CONCLUSIONS OF LAW

1) As applicable and appropriate here, 42 U.S.C. § 2000e–2(a)(1) provides that it shall be an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

2) Also applicable is 42 U.S.C. § 2000e(j) which states, as pertinent here:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

3) The parties agree, and the Court so finds, that the issues here are two: namely, whether such an accommodation could have been made in the instant case without undue hardship on the conduct of the defendant's business; and next, whether the defendant's action in transferring Dixon to its stores department constituted a reasonable accommodation concerning his religious needs and belief.

4) The action of the defendant in accommodating to the plaintiff's religious beliefs during the initial portion of his training period, and up to the time when he would be required to go onto a two-man service crew, is not material here and has no bearing on whether the defendant should have continued to accommodate plaintiff after he commenced work on the service crew.

5) To attempt to accommodate plaintiff as a member of the service crew in this case would have obviously and clearly worked an undue hardship on the defendant and on its customers. In order to arrange that the plaintiff need not perform his regular shift on Saturdays, which would occur with some frequency, the defendant would have had to attempt to replace him with a qualified and equally experienced service man at at least time-and-a-half in pay, and it would be highly questionable, and almost a matter of sheer chance, that a man of the plaintiff's aptitude and training could be secured in all instances, and particularly in time of emergencies. In the instant case, defendant is held to the highest degree of care and efficiency in the construction and maintenance of overhead transmission and distribution lines inasmuch as defendant works with a highly dangerous product in attempting to satisfy the needs of well over five hundred thousand people who rely on defendant for electrical energy. It would seem anomalous to this Court that, charged with such a duty, the defendant could not within reason and fairness be able to depend upon its first line of defense for all emergency situations, with first-line people in attendance.

6) Further, there is another serious aspect to the problem facing the defendant in attempting to accommodate the plaintiff as a member of a two-man service crew. Following plaintiff's completion of the program in question, his next line of duty and progression would be that of foreman of a service crew and there has been demonstrated to the Court no possible way how this situation could be resolved and accommodated by defendant, that is, having to excuse a crew foreman from work who heads up one of only seven crews in the entire district, and this particularly in respect to emergency duty.

7) To accommodate the plaintiff further would clearly have worked an undue hardship on the defendant in the conduct of its business. If possible in the first place, schedules would have to be seriously juggled and the imposition of extra time on other line employees and payment of additional overtime to these other employees would have to be met.

8) The Court further concludes that the plaintiff was given every reasonable accommodation under the circumstances, both temporary and permanent. He, of course, was not discharged and the record clearly shows that every effort was made by defendant to find employment for plaintiff within the O.P.P.D. which would, without undue hardship, accommodate plaintiff in his religious beliefs. In this connection, the Court further observes that plaintiff abandoned his affiliation with the national World Wide Church of God in approximately March of this year and became affiliated with a splinter or local group of this congregation which does not have a strict require-

ment of abstinence from work for compensation on the Sabbath, but there is no evidence in this record that plaintiff, since his new affiliation, has made any effort to try to become reinstated in the journeyman lineman field.

9) We are cited to the case of Hardison v. Trans-World Airlines, 375 F.Supp. 877 (E.D.Mo.1974), and have carefully reviewed this case, along with all others cited to this Court by both parties. Judge John Oliver in *Hardison*, which is a case very similar to the instant case but with a factual situation less compelling so far as defendant here is concerned, thoroughly and logically made the following observations and legal conclusions:

> We find and conclude that TWA's actions with respect to working out plaintiff's religious observance was a reasonable accommodation by TWA and that any further action by TWA would have worked an undue hardship on the conduct of its business. The duty to accommodate does not require that an employer make every effort short of going out of business to permit his employees to stay on the job and also to observe their religion. The term "*reasonable* accommodation" [emphasis added] should be read with the term "undue hardship" to arrive at the proper standard.

> The duty imposed on an employer by Title VII is not a duty to impose hardships on the rest of his employees or members to accommodate the religious beliefs of a few. It is simply a duty to take affirmative action to try to find a way to permit the employee to observe his religion as he wishes, as opposed to a duty simply not to intentionally discriminate. A study of very few cases that have decided the question of whether an employer has made a reasonable accommodation does not contradict that construction. . . .

> We find and conclude that further *accommodation* by TWA would have worked an undue hardship on the conduct of its business. TWA had two choices for further accommodation:

(1) to simply allow plaintiff to take his time off and attempt to replace him; or (2) to force another employee to change shifts.

TWA runs a twenty-four-hour-a-day, seven-days-a-week operation. Plaintiff performed an important job for TWA and was the only person performing his particular job on his shift during the weekend. To replace him with an employee from another area would leave that employee's work crew short. To replace him with an employee who was not regularly scheduled to work at that time would have caused TWA to pay premium wages. Both of these solutions would have created an undue burden on the conduct of TWA's business. Title VII cannot be interpreted to require that companies finance employee's religious beliefs.

For the reasons stated, the Court finds and concludes that the defendant O.P. P.D. did not violate Title VII of the Civil Rights Act of 1964, *supra*, by reason of its transfer of plaintiff because of his refusal to work on his Sabbath day. A separate order dismissing plaintiff's complaint will be entered this day.