John H. DRAPER, Plaintiff-Appellant,

v.

**UNITED STATES PIPE AND FOUNDRY COMPANY, Defendant-Appellee.**

No. 75–1221.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1975.

Decided Dec. 12, 1975.

Rehearing and Rehearing En Banc Denied Jan. 27, 1976.

ler, Vines, Babb & Threadgill, Knoxville, Tenn., Charles Wilson, Tampa, Fla., for defendant-appellee.

Before PHILLIPS, Chief Judge, and PECK and ENGEL, Circuit Judges.

PHILLIPS, Chief Judge.

John Draper was discharged from his position with the United States Pipe and Foundry Company (the Company) after he refused, in accordance with the tenets of his religion, to work on four successive Saturdays. Draper brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging that he had been discharged because of his religion in violation of 42 U.S.C. § 2000e–2(a)(1). The central issue in the case was whether the Company complied with 42 U.S.C. § 2000e(j) and 29 C.F.R. § 1605.1 (1974), both of which in effect require an employer to undertake a reasonable accommodation of its employees' religious practices unless such an accommodation would impose an undue hardship upon the employer's business.[1] After a nonjury trial, the District Court entered judgment in favor of the Company.

The District Judge did not have the benefit of the decisions of this court in *Cummins v. Parker Seal Co.,* 516 F.2d 544, decided May 23, 1975, *petition for cert. filed,* 44 U.S.L.W. 3207 (U.S. Sept. 29, 1975) (No. 75–478), or *Reid v. Memphis Publishing Co.,* 521 F.2d 512, decided August 20, 1975.[2]

Draper perfected this appeal. For the reasons stated below, we reverse and remand for further proceedings.

In 1959, Draper began working for the Company in its Chattanooga, Tennessee, foundry. He was trained as an electrician and worked in the plant's maintenance department. Draper achieved the

Thomas E. Ray, Chattanooga, Tenn., for plaintiff-appellant.

Carol Lynn Green, Equal Employment Opportunity Commission, Washington, D. C., for amicus curiae.

Jac Chambliss, Phillip A. Fleissner, Chambliss, Bahner & Crawford, Chattanooga, Tenn., William D. Vines, III, But-

1. Draper was discharged after the promulgation of 29 C.F.R. § 1605.1 (1974), but before the enactment of 42 U.S.C. § 2000e(j). However, both provisions establish essentially the same reasonable accommodation requirement. *Reid v. Memphis Publishing Co.,* 468 F.2d 346, 351 (6th Cir. 1972). Accordingly, for purposes of this case there is no real difference between

the statute and the regulation. *Cummins v. Parker Seal Co.,* 516 F.2d 544, 547 (6th Cir. 1975).

2. We do not consider that the second opinion of this court in *Reid* is controlling under the facts of the present case.

518

status of top-grade electrician in 1964, and by 1971 he had become "gang leader," a position with some supervisory authority over other electricians. It is agreed that Draper was an experienced and competent employee whose services were valued highly by the Company.

The Company's Chattanooga foundry is an automated plant that produces cast iron soil pipe with a work force of about 600 employees. In order to ensure proper functioning of the machinery, it was necessary for maintenance employees, including electricians, to work not only when the plant was in full production, but also one day each week when the production equipment was not in operation. Accordingly, when the plant was in production four days per week, electricians were scheduled to work Monday through Friday. When increased demand for the Company's products required a five-day production work week, electricians worked Monday through Saturday. The fifteen electricians at the foundry were divided equally into three shifts, which changed at 7:00 a. m., 3:00 p. m., and 11:00 p. m. On Saturdays, however, the Company ordinarily scheduled maintenance work only for the first two shifts—7:00 a. m. to 3:00 p. m. and 3:00 p. m. to 11:00 p. m. In addition, one or two electricians were required to be on hand between 3:00 a. m. and 7:00 a. m. Monday morning to assist in starting up the equipment for the first production shift of the week. Under the collective bargaining agreement, the Company had the right to assign employees to shifts without regard to seniority, although senior employees were given shift preference whenever possible.

In December 1970, Draper joined the World Wide Church of God, which observes the Saturday Sabbath and requires its members to refrain from work between sundown Friday and sundown Saturday. At this time the plant was in production only four days per week, and Draper was scheduled to work the third shift (11:00 p. m. to 7:00 a. m.) Monday through Friday. Draper discussed his conversion with a supervisor, and it was apparent to both that the Saturday Sabbath observance conflicted with Draper's work schedule. Because of the conflict, the men agreed that Draper should seek other employment that would not require work during the Sabbath. In order to facilitate Draper's search for a new job, the Company gave him excused absences from eight Friday night shifts during January and February of 1971. However, on February 25, 1971, Draper notified the Company that he wished to retain his position and offered to work any hours except during the Sabbath. On March 1, 1971, the Company transferred Draper to the first shift (7:00 a. m. to 3:00 p. m.) Monday through Friday, which entailed no conflict with the Saturday Sabbath. Both parties recognized, however, that this was only a temporary solution that would be ineffective if the Company returned to a five-day production work week.

During this period, Draper met with Company and Union representatives in an attempt to arrange a permanent accommodation of his religious beliefs. The Company suggested that Draper bid out of the maintenance department into a first-shift production job. At that time it seemed unlikely that Saturday production work would be scheduled, and therefore such a transfer probably would avoid conflict with the Saturday Sabbath. Nevertheless, the Company made it clear that Draper would be required to work if Saturday production was scheduled. Moreover, in a production job Draper would receive a lower wage and would be largely unable to use his skill and experience as an electrician. Because of his twelve years seniority, Draper probably would have been successful if he had bid on a production job. If the Union had been willing, the Company was even prepared to give Draper special "super seniority" to ensure his ability to obtain a first-shift job in the production department. In any event, because he wished to remain an electrician and because the transfer was not certain to eliminate conflicts with his religious beliefs, Draper did not attempt to bid out of the maintenance department.

The Company also considered other possible arrangements, including the substitution of other electricians for Draper during part or all of any Saturday shifts that might be scheduled. None of the alternatives was considered feasible, and none was put into effect.

In July 1971, increased demand returned the Company to a five-day production work week, and Draper was scheduled to work during the second shift (3:00 p. m. to 11:00 p. m.) on Saturdays. He failed to report for work on four consecutive Saturdays, and the Company terminated him on the basis of the unexcused absences. Draper filed a timely complaint with the Equal Employment Opportunity Commission (EEOC), alleging that the Company was guilty of religious discrimination. The EEOC found reasonable cause to believe that the charge was true and in due course notified Draper of his right to sue. Accordingly, Draper filed this action in the District Court. After a full trial, the court found in favor of the Company and explained its holding as follows:

> The Court is of the opinion that evidence in this case fails to sustain a charge of religious discrimination in connection with the plaintiff's discharge. Rather, the evidence preponderates in favor of a finding that the defendant attempted to reasonably accommodate the plaintiff in his religious convictions, but when such accommodations were found by the plaintiff to be unacceptable, the defendant was unable to further accommodate the plaintiff without modifying its operations in an economically disadvantageous manner and without undue hardship in the conduct of its business. With the defendant's plant operations requiring that maintenance crews work one day more each week than is worked by production workers, there appears to have been no efficient, feasible, and practical means by which the defendant could accommodate the plaintiff both in his insistence in remaining in the electrical classification and in his religious convictions.

After a thorough review of the record in this case, we are convinced that this finding is clearly erroneous. Fed.R. Civ.P. 52(a). The Company did not undertake a reasonable accommodation of Draper's religious practices and observances, nor did it establish that such an accommodation would have imposed an undue hardship upon its business.

The Company takes the position that it did accommodate Draper by allowing him excused absences in January and February of 1971 and by transferring him to the first shift in March 1971. No doubt these were adequate accommodations that fulfilled the Company's statutory obligation during this period. However, the Company's duty to accommodate its employees did not end in July 1971, when production returned to a five-day week and electricians again were scheduled for Saturday work. The Company did not discharge Draper until after increased demand had lengthened the work week, and therefore our inquiry must focus upon the accommodations that were possible in the context of the six-day week required of maintenance employees after July, 1971.

The Company contends that it made a reasonable accommodation of Draper's religious practices by offering to facilitate his transfer to a production job. In certain circumstances such a transfer may be an adequate accommodation. *See Dixon v. Omaha Public Power Dist.*, 385 F.Supp. 1382 (D.Neb. 1974); *Claybaugh v. Pacific Northwest Bell Tel. Co.*, 355 F.Supp. 1, 5 (D.Or. 1973). In this case, however, transfer would have meant a substantial reduction in pay, it would have wasted Draper's skills as an electrician, and there was no assurance that Saturday work would not be required. When a transfer adversely affects an employee to this degree, we believe that the employer first must attempt to accommodate the employee within his current job classification. If no such accommodation is possible, or if it would impose an undue hardship upon the employer, then as a last resort it would become appropriate to

consider a transfer such as the one proposed in the present case. Accordingly, we turn our attention to the ways in which Draper could have been accommodated without sacrificing his position as top-grade electrician.

In July 1971, when production returned to a five-day work week, the Company at least could have experimented with shift exchanges to eliminate Sabbath work for Draper. At this time Draper was scheduled to work the first shift Monday through Friday, which presented no conflict with the Sabbath. On Saturdays Draper was scheduled for the second shift, which conflicted with the Sabbath only between 3:00 p.m. and sundown. The Company could have permitted Draper to report for work at sundown on Saturday and required a first-shift electrician to carry over in Draper's place until sundown. Draper then could have repaid the first-shift employee by substituting for him during the week. On cross-examination, the Company's personnel manager conceded that a shift adjustment such as this might not increase labor costs. Further, under the collective bargaining agreement the Company had the right to make shift assignments as it saw fit.

It appears that other scheduling arrangements were possible. The Company could have given Draper an excused absence for the portion of his Saturday shift before sundown, and he could have been permitted to make up the deficiency by working overtime during the week by performing the weekly start-up maintenance between 3:00 a.m. and 7:00 a.m. Monday morning, or by working the Saturday third shift that was scheduled occasionally. An accommodation of this sort would leave the maintenance department short-handed for part of the second shift on Saturday, but the record indicates that the department operated not infrequently with fewer than fifteen electricians.

■ We think it plain that a reasonable accommodation of Draper's religious practices was possible, and the crucial issue therefore is whether the accommodation would have imposed an undue hardship on the Company's business. We may assume that any accommodation would entail some hardship on the Company, but, as we held in *Cummins v. Parker Seal Co.,* 516 F.2d 544, 551 (6th Cir. 1975), "[u]ndue hardship is something greater than hardship," and an employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine. In addition, we are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted. *See Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937, 941–42 (M.D.Ala.1974); *Claybaugh v. Pacific Northwest Bell Tel. Co.,* 355 F.Supp. 1, 6 (D.Or.1973). Nevertheless, it is possible for an employer to prove undue hardship without actually having undertaken any of the possible accommodations, and we must determine whether the Company has made such a showing in this case.

■ The Company first suggests that to force other employees to exchange shifts with Draper or to substitute for him would impose a hardship on his co-workers and might cause "grumbling" among them. A similar argument was made and rejected in *Cummins v. Parker Seal Co., supra*:

The objections and complaints of fellow employees, in and of themselves, do not constitute undue hardship in the conduct of an employer's business. If employees are disgruntled because an employer accommodates its work rules to the religious needs of one employee, under EEOC Regulation 1605 and § 2000e(j) such grumbling must yield to the single employee's right to practice his religion. Moreover, the fact that Saturday Sabbath observance by one employee forces other employees to substitute during weekend

hours does not demonstrate an undue hardship on the employer's business. It is conceivable that employee morale problems could become so acute that they would constitute an undue hardship. The EEOC, in interpreting Regulation 1605, has noted the possibility of undue hardship when the employer can make a persuasive showing that employee discontent will produce "chaotic personnel problems." EEOC Decision No. 72–0606 (Dec. 22, 1971), CCH EEOC DEC. ¶ 6310, at 4555 (1972); EEOC Decision No. 71–463 (Nov. 13, 1970), CCH EEOC DEC. ¶ 6206, at 4350 (1972). 516 F.2d at 550.

The record in this case certainly does not establish that accommodating Draper's religious practices would produce chaotic personnel problems. Indeed, there is little or no proof that the other employees would object at all. Moreover, there is no requirement that a single employee be required to exchange shifts with Draper every Saturday. Ideally, the substitution would be effected on a voluntary basis. If not, the Company could rotate the assignment among several electricians so that the burden would not fall heavily upon any particular employee.

The Company also points out that an accommodation would require some electricians to work longer than eight hours on certain days. In view of the sophisticated and dangerous electrical equipment in the plant, the Company argues that the long hours and the resulting fatigue would create a safety hazard, particularly if double shifts—sixteen hours per day—were scheduled regularly. Initially, we note that safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business. Title VII does not require that safety be subordinated to the religious beliefs of an employee. *See Dixon v. Omaha Public Power Dist.,* 385 F.Supp. 1382, 1386 (D.Neb.1974). In the present case, however, the Company has not sustained its burden of proving that Draper could not

have been accommodated without jeopardizing the safety of its Chattanooga foundry. It was not inevitable that sixteen-hour days would result from an accommodation of Draper's religious practices and observances. If Draper worked on Saturdays from sundown to 11:00 p. m., the electrician carrying over from the first shift would only be required to work from ten to fourteen hours, depending upon the season. According to the Company's personnel manager, the current collective bargaining agreement permits the Company to require employees to work up to twelve and one-half hours per day. Although this provision was not in force at the time this case arose, it does provide some indication of the Company's attitude toward work days longer then eight hours. In addition, the record indicates that for a variety of reasons maintenance employees not infrequently are required to work more than eight hours in one day.

The record contains little testimony directly relating to plant safety. The Company's personnel manager testified as follows:

Q. Do you feel that [allowing an employee to work 16 hours] would be safe or practical on a permanent basis?

A. The longer a man works and the more fatigued he becomes, the more liable he is to have an accident, and this is one of the main reasons that for my point of view in my position I do not like long shifts, and I certainly would not like a 16-hour shift.

Q. Do the electricians work with highly sophisticated electrical devices?

A. Yes, sir, they do.

Q. And supposing that there is a mistake made on one of those devices. Can that result in serious bodily injury either to them or to the production workers?

A. Yes, sir, it could.

Draper's foreman gave the following brief response:

Q. Is it a safe practice to require-ment men to handle this electrical equipment on a regular basis and hav-ing to work 16 hours a day?

A. No.

█ It may be that sixteen-hour work days for maintenance employees would create safety problems. The evidence demonstrates, however, that days of this dangerous length were not the unavoida-ble by-product of any accommodation to Draper's religious beliefs. On this record, we believe that the Company has not proved that accommodation would have caused safety problems amounting to undue hardship.

█ Finally, the Company suggests that to accommodate Draper would be to prefer him over other employees in viola-tion of the overtime allocation provisions and the seniority system established by the collective bargaining agreement. We are not convinced. The Company had the right to direct the work force and to assign employees to shifts with-out regard to seniority. If the Company had arranged a partial shift exchange to avoid Sabbath work for Draper, there would have been no disproportionate as-signment of overtime to Draper and no reduction in the amount of overtime available to other employees. Moreover, there is no indication that the Union would have objected to a shift exchange arrangement so long as sixteen-hour days were not scheduled on a regular basis. We see here no insurmountable conflict between the collective bargain-ing agreement and the duty to accommo-date Draper's religious practices.

█ We conclude that the Company failed to accommodate Draper's religious beliefs and has not proved that any such accommodation would have imposed an undue hardship on the conduct of its business. Accordingly, by discharging Draper the Company has discriminated against him on the basis of religion in violation of Title VII.

█ At oral argument, the attor-ney for the Company suggested that this suit might be barred by Tennessee's one-year statute of limitations, T.C.A. § 28–304. We reject this contention. Title VII provides specific time periods for the filing of a charge with the EEOC and for commencing a civil action after re-ceipt of the right-to-sue letter. 42 U.S.C. § 2000e–5(e, f). Title VII estab-lishes its own statute of limitations, and state law is irrelevant in determining whether a private individual has lost his right of action under Title VII through the passage of time. *See Piva v. Xerox Corp.,* 376 F.Supp. 242, 245 (N.D.Cal. 1974); *Kaltenborn v. Excel Personnel,* 339 F.Supp. 129, 130–31 (W.D.Tenn. 1972); *Jackson v. Cutter Laboratories, Inc.,* 338 F.Supp. 882, 885 (E.D.Tenn. 1970). The record and the stipulations of the parties disclose that Draper com-plied with the procedural requirements of Title VII, and his suit is not time-barred.

█ In cases arising before the effective date of the 1972 amendments to the Civil Rights Act of 1964, state statutes of limitations are relevant in de-termining the maximum period for which an individual claimant may recov-er back pay. *See EEOC v. Detroit Edi-son Co.,* 515 F.2d 301, 315–16 (6th Cir. 1975); *United States v. Georgia Power Co.,* 474 F.2d 906, 922–25 (5th Cir. 1973).[3] Under the 1972 amendments, which ap-ply to the case at bar, "[b]ack pay liabili-ty shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C. § 2000e–5(g). Thus state law does not apply to determine the timeliness of the action or to limit the relief available to Draper.

We turn finally to the issue of relief. Draper does not wish to be reinstated; he seeks only back pay and attorney's fees. The parties stipulated that $5,630.34 in back pay would compensate Draper, but we do not understand this to

3. Appellee relies on *EEOC v. Griffin Wheel Co.,* 511 F.2d 456 (5th Cir. 1975). We do not construe this case to change the Fifth Circuit rule announced by Judge Tuttle in *United States v. Georgia Power Co., supra.*

be a concession by the Company that an award of back pay would be an appropriate exercise of the District Court's discretion in the present case. Although the amount of the award has been established, the District Court on remand still must determine in the first instance whether back pay is a proper remedy in this case, keeping in mind the standards recently announced by the Supreme Court in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In addition, the court should consider Draper's claim for attorney's fees under 42 U.S.C. § 2000e–5(k).

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion. The costs of appeal are taxed against the United States Pipe and Foundry Company.

ENGEL, Circuit Judge (dissenting).

I respectfully dissent. The trial judge made the following findings of fact:

> The plaintiff has advanced several possible work schedules that would accommodate him in his religious convictions, including third shift work upon Saturday night, Sunday work, or split shift or double shift work during the week with a swapout upon the Saturday shifts. The evidence appears to preponderate against the feasibility of each of these suggested accommodations. Any doubling up on shifts or splitting shifts to accommodate the plaintiff would have imposed not only a variable individual scheduling problem for the defendant, but would also have involved a violation of seniority practices and an unequal assignment of overtime, matters contrary to company policies and objectionable to the plant union. With regard to a third shift assignment upon Saturday night or a Sunday assignment, not only does Sunday work require double time premium pay, but also the evidence reflects that satisfactory performance of electrical maintenance work requires that a crew of at least two, and preferably more, electricians be scheduled for any one shift. The work cannot be satisfactorily performed by the scheduling of a single electrician upon a shift. Likewise, the effective use of a maintenance crew requires the presence of other supporting personnel, including supply clerks, safety and first aid personnel. Accordingly, in the absence of scheduling a full crew upon a Saturday night or Sunday, a practice not customarily followed by the defendant and one that would require the defendant to pay double time on Sunday, the scheduling of an individual electrician to work during that period would be both inefficient and impractical for the defendant in terms of laying out the work and in terms of the work that could be performed by a one man crew. Moreover, this arrangement could involve excusing the plaintiff from a second or third shift assignment upon Friday, a matter that would in effect accord the plaintiff super seniority rights, a matter objectionable to the union.

My own review convinces me that the foregoing findings are amply supported by the record and are not clearly erroneous.

In *Cummins v. Parker Seal Company*, 516 F.2d 544 (6th Cir. 1975), the majority observed:

> The District Court found that Appellee "made a reasonable accommodation to [Appellant's] religious needs and that no further accommodation could be made at the time of [Appellant's] dismissal from employment without creating an undue hardship on the employer's business." The court did not specify what "undue hardship" would have resulted and did not explain why an accommodation that was reasonable for over a year (from July 1970, when Appellant joined the World Wide Church of God, until his discharge) suddenly became unreasonable in September 1971. 516 F.2d at 547.

Here it would appear to me that the trial judge carefully avoided the error complained of in *Cummins* for he was most specific in setting forth what "un-

due hardship" would have resulted. Beyond that he did in fact explain why the accommodation which was made originally became unreasonable later when the company went on a five-day production schedule. It therefore comes as a surprise to me to learn that the findings here are likewise to be deemed clearly erroneous, and I find myself complaining much as did Judge Edwards in his dissent in *Reid v. Memphis Publishing Company,* 521 F.2d 512 (6th Cir. 1975), decided August 20, 1975, that

> "As I view the matter, the majority opinion retries this case on the written record, giving no weight to the great advantage the trial judge has in seeing, hearing and judging the credibility of the witnesses." *Reid v. Memphis Publishing Co., supra,* at p. 523.

No error of law by the trial judge is pointed out by the majority opinion. While it is true that he did not have the benefit of *Cummins* and *Reid,* there is no suggestion that he was led into error for the want of such guidance. The absence of legal error is at least of some weight in judging the fairness with which the trial judge approached the facts before him. There are other equally persuasive indications that his decision was correct.

As I understand the principal thrust of the majority's opinion, it is that although the company reasonably tried to accommodate to Draper's religious views while it was on a four-day production schedule, it did nothing further when the increased demands for products required a five-day production work week. As I read the proofs, it is clear that the problem which would develop with a five-day production schedule was anticipated well in advance of the event by the management, and that it had already thought long and hard about possible means of accommodating Mr. Draper's religious needs as a valued employee. The district court's findings of fact address themselves specifically to the problems generated by the five-day production schedule and the consequent need for electrical maintenance work on Saturday. There is no gap either in logic or in proof.

What makes the district court's findings here so especially entitled to credit is the fact that there is absolutely no suggestion of religious bias or prejudice in the record. Draper was a valued and greatly needed employee who enjoyed a close friendship with the man who finally discharged him. These additional circumstances strongly support a finding that the company was willing to and did undergo considerable hardship in order to retain him. This is not a case where Draper's discharge was pretextual, masking a latent bias against his faith or against him for adhering to it.

Finally, I am unable to veil a growing concern on my part that those who read our majority decision here and in *Reid* and *Cummins* may conclude that in this area of law our circuit in effect has instituted a practice of de novo review at the appellate level.

The area of accommodation to religious beliefs is a new and sensitive one. Nevertheless, I hope that we can ultimately approach it in a way which is more consistent with the essentially different roles of the trial and appellate courts.