Edward D. SHAFFIELD, Jr.,
Plaintiff,

v.

NORTHROP WORLDWIDE AIRCRAFT SERVICES, INC., Defendant,

United States Equal Employment Opportunity Commission, Amicus Curiae.

Civ. A. No. 1310–S.

United States District Court,
M. D. Alabama, S. D.

March 21, 1974.

Howard A. Mandell, Montgomery, Ala., for plaintiff.

Edward E. Soule, Lytle, Soule & Emery, Oklahoma City, Okl., for defendant.

Charles Hodge, an attorney for the United States Equal Employment Opportunity Commission, Washington, D. C., for amicus curiae.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

Plaintiff is a member of the Seventh Day Adventist Church and, as such, believes that his religion prohibits his working between sundown on Friday and sundown on Saturday, except in situations involving emergency to life or property. Plaintiff was employed as a helicopter mechanic by defendant Northrop Worldwide Aircraft Services, Inc., and by its corporate predecessor in the activity of aircraft maintenance and repair at Fort Rucker, Alabama. Plaintiff was so employed from 1966 to 1972, when he was fired for the stated reasons of leaving work without permission and insubordination.

Plaintiff brought suit in this Court pursuant to Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e–2(a)(1). Plaintiff claims that defendant was guilty of an actionable wrong, religious discrimination prohibited by Title VII, when it failed to make a reasonable accommodation to his religious beliefs and practices. Defendant denies that it failed to make a reasonable accommodation to plaintiff's religious beliefs and practices, and this is the sole issue for trial on the merits if this Court has subject matter jurisdiction over this case. However, defendant raises a challenge to the jurisdiction of this Court in this cause.

### I. *Jurisdiction*

During the trial of this case, defendant moved to dismiss for lack of subject matter jurisdiction, basing its motion upon legal developments which had come

to the attention of defendant's counsel during the course of trial. The motion to dismiss was denied in open court on February 15, 1974, but defendant was orally granted leave to amend in order that its answer would reflect a defense of lack of subject matter jurisdiction. The effect of the Court's action was to reserve ruling on the motion.

Defendant contends, among other things, in its answer that the "right to sue" letter issued to plaintiff in this case is invalid for failure of the Equal Employment Opportunity Commission (hereafter "EEOC") to comply with the provisions of the Freedom of Information Act, 5 U.S.C. § 552. Defendant views this alleged defect as jurisdictional and asserts that this action must be dismissed for lack of subject matter jurisdiction. Defendant relies upon McDonald v. General Mills, Inc., (E.D. Cal.1974), in which a lack of subject matter jurisdiction was found to exist in a case similar in many respects to this one.

After trial, the EEOC moved for leave to appear as *Amicus Curiae* in this case. The brief filed by the EEOC indicates that the procedural stance of this case raises novel issues, relating to the procedures used in Title VII claims, which deserve consideration.

Under the procedures of Title VII of the 1964 Civil Rights Act, the EEOC, if it is unable to effect a nonjudicial settlement, notifies the aggrieved party who then has ninety days within which to file suit. 42 U.S.C. § 2000e–5(f)(1). Courts frequently state that lack of such a "right to sue" letter, or "suit letter," is a jurisdictional defect:

> [T]he tenor of the cases has established only two jurisdictional prerequisites to suit in federal court under Title VII: (1) the filing of a complaint with the EEOC and (2) the receipt of the statutory notice of right to sue . . . .

Beverly v. Lone Star Lead Constr. Corp., 437 F.2d 1136, 1139–1140 (5th Cir. 1971).

Defendant contends that (1) the EEOC manual pursuant to which plaintiff's suit letter was issued was invalid for failure to comply with the Freedom of Information Act, since it was marked "Administratively Restricted"; (2) the delegation to the EEOC district directors of the right to issue such suit letters, being in the invalid manual, was itself an invalid delegation, and the district director therefore had no power to issue suit letters; (3) this suit letter, having been issued without a valid delegation of authority, is an invalid suit letter; (4) since the holding of a suit letter is a jurisdictional necessity to suit under Title VII, the holding of an invalid suit letter is a jurisdictional defect; and (5) therefore this case must be dismissed for lack of subject matter jurisdiction.

The memorandum of the EEOC as *Amicus Curiae* in this case points out that defendant's argument is factually in error, although a close analysis of the procedural facts here has raised a similar problem.

It is necessary in the consideration of this question to examine the provisions of two EEOC manuals and an amendment to the latter manual. The first EEOC manual with which we are here concerned was issued on October 15, 1969, and was marked "Administratively Restricted." The court in McDonald v. General Mills, Inc., (E.D.Cal.1974), dealt with a suit letter issued pursuant to that manual. The 1969 manual delegated to EEOC district directors the power to issue suit letters. A new manual was issued and became effective on May 21, 1973, which apparently contains none of the attributes said in *McDonald* to violate the Freedom of Information Act. However, through inadvertence (according to the memorandum of the EEOC in this case), the new manual omitted a delegation to district directors of the power to issue suit letters. This defect was corrected by an amendment which, becoming effective on November 28, 1973, delegated to EEOC district directors the power to issue suit

letters. The suit letter in this case was issued on August 15, 1973, during the hiatus in which the EEOC had inadvertently failed to grant to the district directors the power to issue suit letters. The jurisdictional issue, then, is whether this case should be dismissed for lack of jurisdiction because the EEOC is later found to have inadvertently failed to delegate the power to issue suit letters. The spirit and history of Title VII demand that such result be rejected. "To deny relief under these circumstances would be a meaningless triumph of form over substance." Choate v. Caterpillar Tractor Co., 402 F.2d 357, 360 (7th Cir. 1968).

■ Our polestar in this analysis should be the fundamental principle of Title VII that procedural niceties should not be used to impede a claimant in his quest for a hearing on the merits of his case. Burns v. Thiokol Chem. Corp., 483 F.2d 300, 305 (5th Cir. 1973); Sanchez v. Standard Brands, 431 F.2d 455, 465 (5th Cir. 1970).

■ A suit letter under Title VII is not a talismanic device.

The sole purpose of [the "right to sue" letter] is to provide a formal notification to the claimant that his administrative remedies with the Commission have been exhausted.

Beverly v. Lone Star Lead Co., 437 F.2d 1136, 1140 (5th Cir. 1971). The issuance of a suit letter "is 'no more than a formality.'" Stone v. E.D.S. Federal Corp., 351 F.Supp. 340, 343 (N.D.Cal. 1972).

Not only is the suit letter a mere formality, but plaintiff in this case followed every step expected of him. After having filed a complaint with the EEOC, he obtained what everyone considered to be a valid suit letter and properly brought suit in this Court. Any fault certainly does not lie with plaintiff but with the EEOC, if with any party. Courts have been adamant in refusing to

penalize Title VII plaintiffs for wrongs or mistakes committed by the EEOC. In Dent v. St. Louis-San Francisco Ry. Co., 406 F.2d 399 (5th Cir. 1969), cert. denied sub nom., Hyler v. Reynolds Metals Co., 403 U.S. 912, 91 S.Ct. 2219, 29 L.Ed.2d 689 (1971), the lower court held that an actual attempt at conciliation by the EEOC was a jurisdictional prerequisite to suit. The Court of Appeals refused to adopt such a construction, noting that the

dismissal of these cases deprived the aggrieved employee of that right of action, not because of some failure on his part to comply with the requirements of the Title, but for the Commission's failure . . . —a failure that was and will always be beyond the control of the aggrieved party.

Id. at 403. The Court of Appeals for this circuit has also rejected another crabbed jurisdictional construction of Title VII, suggesting that

[i]t seems completely unfair to nullify the grievant's complaint by a nonreviewable conclusion of the Commission, particularly when he has fully complied with the requirements of the statute.

Beverly v. Lone Star Lead Constr. Corp., 437 F.2d 1136, 1141 (5th Cir. 1971).

After an aggrieved person, such as plaintiff in this case, has filed a charge and obtained his suit letter from the EEOC, he has done all that is expected of him prior to bringing suit. He has carried every burden which Title VII requires him to carry prior to suing in the district court.

No party has cited a decision directly in point on this issue and presumably there is none. This Court is convinced, however, that under the facts of this case the inadvertent error of the EEOC, upon which no party has relied to his detriment, does not constitute a defect in the jurisdiction of this Court over this case.[1] Plaintiff's case will be considered upon the merits.

---

1. The EEOC, as *Amicus Curiae* in this case, has provided this Court and all parties with

copies of amended regulations which delegate to EEOC district directors the power to is-

## II. Law Applicable to the Merits

■ It is now abundantly clear that the statutory duty of an employer not to discriminate upon grounds of religion includes a duty to make reasonable accommodations to the religious needs of an employee by allowing, whenever reasonably practicable, some latitude in the employee's work schedule so as to free him for religious observances which his denomination is obliged to honor. Since 1967, the following regulation has been in effect under Title VII of the 1964 Civil Rights Act:

> The Commission believes that the duty not to discriminate on religious grounds, required by Section 703(a) (1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

29 C.F.R. § 1605.1(b) (1972). Under the regulations, the burden of proof is upon the employer to show that such an accommodation would in fact constitute an undue hardship. 29 C.F.R. § 1605.1 (c) (1972). These regulations were in effect during the last five of the six years of plaintiff's employment by defendant and its predecessor.[2] Their

validity, under the statute as it was worded from 1964 until 1972, has been recognized in this circuit.[3] On March 8, 1972, some four and one-half months prior to plaintiff's discharge, Congress passed a statutory amendment which substantially codified, and gave additional force to, the 1967 regulations. The 1972 amendment provided that:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates* that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (emphasis added).

Under this statute, the *employer* must prove either that he in fact made a reasonable accommodation, or that he was unable reasonably to accommodate to an employee's religious observances. Generally, the issue in cases of this nature is whether the rearranging of the work schedule would cause undue hardship. Reid v. Memphis Publishing Co., 468 F. 2d 346 (6th Cir. 1972) ; Jackson v. Veri Fresh Poultry, 304 F.Supp. 1276, 1278 (E.D.La.1969). Of course, in very small offices and enterprises (with which we are not here concerned) the shifting of one employee to another shift may cause very real hardship to an employer. See Johnson v. United States Postal Service, 364 F.Supp. 37 (N.D.Fla.1973). However, "[I]nconvenience is not 'undue hardship.'" Kettell v. Johnson and Johnson, 337 F.Supp. 892, 895 (E.D. Ark.1972). The burden is upon the *em-*

---

sue suit letters. 29 C.F.R. § 1601.25 (1974). Furthermore, the EEOC on March 15, 1974 "formally ratified the acts of the District Directors of EEOC District Offices in issuing notices of Right-To-Sue .. . .." However, since this Court finds that the defective suit letter does not constitute a jurisdictional defect in this case, it is not necessary to consider the applicability of the action of the EEOC in ratifying the past actions of the district directors.

2. Plaintiff first began his work as a helicopter mechanic at Fort Rucker or its environs in 1966. The regulations presently in effect

were adopted on July 13, 1967, and they remain in effect to date.

3. There was originally some doubt as to the validity of the regulations, arising out of the decision of the United States Court of Appeals for the Sixth Circuit in Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), aff'd by an equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). However, in this circuit the regulations must be regarded as having been valid from their adoption until the present. Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir. 1972).

*ployer* to seek the cooperation of other employees, if necessary; and it is clear that the employer must show that it in fact attempted an accommodation, if it is to carry its burden of proof. Claybaugh v. Pacific Northwest Bell Tel. Co., 355 F.Supp. 1 (D.Or.1973).

■ In some cases, the existence of a seniority agreement might limit the freedom of an employer to effect the necessary reasonable accommodation. See 42 U.S.C. § 2000e–2(h) (Mansfield-Dirksen Amendment). In this case, however, it is clear that the collective bargaining contract does not bind the company to the sole use of seniority in the making of shift assignments. The applicable section in the agreement provides that:

> The company agrees to the principle that shift and odd work week preference for available jobs should be given to senior employees in each classification. It is recognized, however, that it is impossible to operate the plant efficiently with all the senior employees in a particular classification on any shift, and that *classification seniority cannot be the sole determining factor in making shift assignments.*

Article IV, § 11(a), Collective Bargaining Agreement. When management retains such flexibility of operation, it cannot be heard to plead that its hands are tied by a seniority agreement. And, in addition, even if the company were so bound, it may well be that the company's burden includes seeking union consent to some form of variance. "[I]t is the employer's burden to seek union assistance, not the employee's." Claybaugh v. Pacific Northwest Bell Tel. Co., 355 F. Supp. 1, 6 (D.Or.1973). Here, the seniority agreement does not constitute a valid defense.

### III. *Findings of Fact*

■ Plaintiff, a 28 year old Caucasian male, was hired in 1966 by Page Aircraft Maintenance, Inc., which provided service to the helicopters at the Army's helicopter flight school at Fort Rucker, Alabama. At that time plaintiff was a Baptist. He worked overtime and on Saturdays, from time to time. There appears to be no dispute over the fact that plaintiff is a competent mechanic. In December of 1970 or January of 1971, plaintiff joined the Seventh Day Adventist Church, where he is now an Elder. One of the tenets of plaintiff's new faith is that adherents should do no secular work on the Sabbath, *i. e.*, between sundown Friday and sundown Saturday, unless there is an emergency involving life or property.

In 1971, while plaintiff was on the day shift, there was no conflict between his job and his religion as he was off duty by sundown Friday. However, the decrease in Army activity pursuant to the end of the war in Vietnam meant that some employees would have to be laid off at the helicopter shops operated by defendant. Since shift preference was determined by classification seniority, junior employees were gradually moved to less desirable shifts, in particular evening and night shifts. Plaintiff quickly realized that he was in danger of being assigned to a shift which would precipitate a conflict with his religious practices. He sought out his supervisors, Oates and Baxley, in the fall of 1971, explained his predicament, and asked for help. Oates agreed to check on the problem but later said only that perhaps no one would be laid off. Plaintiff again got in touch with Baxley, who said that if the company let plaintiff off on Saturday that would constitute discrimination against the other employees. Plaintiff then spoke with Mr. Woods, the highest level management official at the field, in October of 1971. Plaintiff explained his problem and asked for help. Mr. Woods said that if *plaintiff* could find someone to swap jobs with him, that would be all right with the company but if plaintiff refused to work on Friday nights, he would be fired. Plaintiff made an effort, by the use of notices on bulletin boards, to effect such a job exchange

but could find no one willing to trade jobs. Plaintiff was then placed on the second shift in January of 1972, which necessitated his working after sundown on Friday. Plaintiff discussed his problem with Mr. Thompson, the general foreman of the second shift, explained his difficulty, and asked for help. Thompson offered to take the matter up with Mr. Woods, but no response was forthcoming from Mr. Woods. Then, plaintiff was put on the 11:30 A.M. wash rack shift, which ran past sundown. On this job, plaintiff's supervisor permitted him to leave work early and usually plaintiff had finished his work before leaving. On April 3, plaintiff was taken off the wash rack and placed on a 2:30–11:00 P.M. shift although another mechanic with similar seniority remained on the 11:30 wash rack shift. After one week, plaintiff was again transferred, this time to the 5:30 P.M.–2:00 A.M. daily inspection crew. Plaintiff's supervisor, Mr. Ward, knew of plaintiff's predicament. During the month of April, plaintiff did not go in at all on Friday, since sundown was half an hour later and his religion required that he be home by sundown. Plaintiff was given a "pink slip" for being absent three Friday nights. Plaintiff explained his predicament to Mr. Mizell who gave plaintiff the "pink slip", and Mr. Mizell agreed that if plaintiff would come in and work a little on Friday, he could get off early. Daylight Saving Time then came into use, so plaintiff was able to work for two hours before leaving. When Knox Field closed, plaintiff was transferred to Lowe Field for a 3:30 P.M.–12:00 P.M. shift. Plaintiff reported on the first Friday thereafter, June 2nd, and told Mr. Palmer (his supervisor) that he wanted off, explaining why. Mr. Palmer agreed to let plaintiff off that Friday but stated that this could not be done regularly. Palmer communicated with plaintiff the next week and told plaintiff that the Bible stated that if an ox fell in a pit on Saturday, one ought to pull him out. On June 15, 1972, Mr. Palmer gave plaintiff another "pink slip" and put plaintiff on notice that if he left early again on Friday, he would be fired for insubordination. Plaintiff was, by reason of having received the "pink slips", also suspended for three days and transferred to the 5:30 P.M. shift at Cairns Field. Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC). Plaintiff again discussed his problem with management, this time with Mr. Thompson who said he would take the problem up with higher authority. No one ever got in touch with plaintiff as a result of his discussion with Mr. Thompson. Then, plaintiff was again transferred, this time to the 2:30–11:00 P.M. wash rack. Plaintiff went to Mr. Joe Smith, his supervisor, and again explained his problem, to no avail. There was then a supervisory change, and plaintiff again pointed out his predicament to his new supervisor, Mr. Jones. Mr. Jones told plaintiff that he could not leave work early on Friday. Finally, on July 26, 1972, plaintiff was fired for insubordination and for leaving work early. The "insubordination" had to do only with plaintiff's leaving work early.

No management employee had *ever* contacted plaintiff to attempt to effect an accommodation to plaintiff's religious needs and practices. Plaintiff explained the nature of his problem to his supervisors at least nine times and even put defendant on notice of the problem by filing a complaint with the EEOC. Company management never made any effort to effect an accommodation to plaintiff's needs. It is true that an occasional supervisor would from time to time (though not always) let plaintiff leave early, but the evidence shows that, far from being a special accommodation for plaintiff, it was a routine practice to let some employees leave early on occasion. Defendant's management personnel, the evidence shows, told plaintiff that they regarded him as being in the same category as employees who wished to get off work early on Fridays in order to go to football games. Mr. Carmi-

chael, defendant's Director of Industrial Relations, knew of plaintiff's religious practices predicament and, though he had never dealt with a similar problem, did not seek the legal advice of corporate counsel on the matter. Carmichael spoke with Childs, his superior, about plaintiff's problem, and Childs agreed that the company should not alter its policy that "treated all employees alike" in that they could get off if the workload permitted.

Plaintiff introduced evidence which showed, and this Court finds, that defendant had numerous opportunities to place plaintiff in suitable positions in which his religious practices would be no burden to the defendant or its work. Many of these positions were subsequently filled by new or recalled employees; therefore, placing plaintiff in one of these jobs would have avoided the necessity of transferring any other employee to another shift in order to help plaintiff and would have avoided any possible seniority problems inherent in effecting an accommodation by mutual transfer.

Plaintiff has proved an extraordinarily strong case of religious discrimination, with facts remarkably similar to the facts in Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir. 1972). This Court finds that defendant had both knowledge of plaintiff's problem and numerous opportunities to effect an accommodation with only minimal disruption of business. Defendant cannot insulate itself from the prohibition against religious discrimination by characterizing plaintiff's conduct as "leaving work without permission" or "insubordination." To allow this would ignore the legal duty on the defendant to make reasonable accommodation to the religious needs of plaintiff. To find such a justification for defendant's firing plaintiff, under the factual circumstances of this case, would emasculate the provisions [including the regulations] of the law that placed the obligation on Northrop to make the necessary reasonable adjustments.

The facts presented in this case reflect that plaintiff had done everything required of him to put the defendant and its supervisory officials on notice as to his problems. The attitude and conduct of the defendant's supervisory officials in ignoring plaintiff's religious practices or refusing plaintiff any relief, and in transferring him to a job with a more severely conflicting schedule, literally put plaintiff in an untenable position. He was faced with leaving early on Fridays, not reporting at all on Fridays or sacrificing his religious views and practices. Such a situation is precisely what the law has attempted to avoid.

In summary, this Court wishes to emphasize that defendant made absolutely no efforts to accommodate plaintiff's needs and that reasonable accommodations could have been made with little or no effort on defendant's part and without any inconvenience or disruption in the performance of defendant's work. Defendant has not met its burden of proof of showing that effecting an accommodation would place an unreasonable burden, or indeed any burden, on its business operation. Plaintiff is entitled to judgment.

## IV. Back Pay and Reinstatement

■ This is an appropriate case for an award of equitable relief in the form of back pay computed from the date of plaintiff's discharge to the date of judgment which will be entered in this case. 42 U.S.C. § 2000e–5(g). It should be noted that "interim earnings . . . shall operate to reduce the back pay otherwise allowable." Id.

There are indications that plaintiff in this case has held several different jobs since his discharge. It is not clear whether these jobs were held concurrently or seriatim. Plaintiff and defendant should, if possible, enter into a stipulation regarding the specific dates and earnings of interim employment held by plaintiff. A hearing upon this issue will be scheduled if this matter of

computation cannot be stipulated or submitted upon documentary evidence.

In the drafting of a stipulation or of opposing affidavits or memoranda, the parties should address themselves to whether, under the facts of this case, income from "moonlighting" jobs, if any there were, should be deducted as interim earnings or, alternatively, ignored as permanent job earnings. In so doing the parties should consider the application of the test enunciated by the Court of Appeals for this circuit:

> If a supplemental or moonlight job is one that the discriminatee cannot perform when he wins his new position, the supplemental job is necessarily temporary, provisional or "interim." By contrast, if one can hold his supplemental job and his desired full time job simultaneously and there is reason to believe he will do so, the supplemental job assumes a permanent rather than interim nature. Those earnings would be independent of the position sought and should not be taken into account in back pay calculations.

Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973).

Further, if jobs held by plaintiff involved longer working hours for the same or similar levels of pay, the parties in their memoranda (if they are not able to stipulate the amount of back pay involved) should address themselves to the issue of whether the longer hours necessary on interim jobs may be considered and whether such longer hours should be considered in back pay computations.

In addition, defendant must reinstate plaintiff in a position that will accommodate his religious views and practices and also place him at the level of pay and seniority which would have been his had he remained in defendant's employ since the time of his discharge. Defendant will be further ordered to grant to plaintiff any retirement, pension or other rights or benefits which would have accrued to plaintiff during this period. If plaintiff would have been required to contribute part of his pay for these benefits, defendant may properly deduct such contribution from its liability for back pay. In order to effectuate the policies of Title VII, it is necessary in this case to reinstate plaintiff in the position he would have held, with all its emoluments, had he not been fired in violation of Title VII. See 42 U.S.C. § 2000e–5(g).

### V. *Attorney's Fees*

Plaintiff has prayed for an award of attorney's fees as a part of the costs of this litigation. Title VII provides in part that:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs [of the litigation].

42 U.S.C. § 2000e–5(k). The Court of Appeals for this circuit,

> as part of its obligation "to make sure that Title VII works," has liberally applied the attorney's fees provision of Title VII, recognizing the importance of private enforcement of civil rights legislation.

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 716 (5th Cir. 1974). See also Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Long v. Georgia Kraft Co., 455 F.2d 331 (5th Cir. 1972); Lee v. Southern Homes Sites Co., 444 F.2d 143 (5th Cir. 1971). Clearly this is an especially appropriate case for attorney's fees, since a sizeable corporation obstinately put an individual plaintiff to the expense of full trial upon a very clear case of liability under Title VII.

Both plaintiff and defendant shall within 20 days file affidavits from attorneys engaged in regular practice in this district, showing the amount of a reasonable attorney's fee to be paid plaintiff in this case. The parties should address themselves to the applicability in this case of the several factors discussed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).

Judgment will be entered accordingly.