**UNITED STATES of America, Plaintiff,**

v.

**CITY OF ALBUQUERQUE, a Municipal Corporation, et al., Defendants.**

**Civ. No. 10442.**

United States District Court,
D. New Mexico.

April 30, 1975.

Brian K. Landsberg, Dennis J. Dimsey, United States Dept. of Justice, Civ. Rights Div., Washington, D. C., for plaintiff; Terence G. Connor, Atty., Employment Section, Washington, D. C., of counsel.

Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, N. M., for defendants; Duane C. Gilkey, Kenneth R. Brandt, Albuquerque, N. M., Elizabeth Love, Asst. City Atty., Albuquerque, N. M., of counsel.

PALMIERI, District Judge.*

*Preliminary Statement*

This action was brought by the Government pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1345 to enforce the provisions of Title VII Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq.*), on behalf of Salomon Zamora, a fireman employed by the City of Albuquerque. In 1971, two years after his employment, Zamora rejoined the Seventh Day Adventist Church of which he had previously been a member, thereby embracing a Sabbath observance from sundown Friday to sundown Saturday.

Zamora was assigned to one of three fire fighting districts, each having a geographical area and consisting of several engine and ladder companies. Each district was manned by three platoons of firemen rotating on a fifty-six hour work schedule, so that two platoons would be on duty during any one day, on a day shift from eight to six, and on the night shift from six until eight the next morning. The platoons rotated, so that each had three day shifts, three night shifts and three off. In consequence, days off changed because of the rotation of platoons and no fireman ever had the same days off.

There can be no question that firemen seeking time off when they were otherwise scheduled to work had the benefit of as flexible a system of regulations as could be expected under the circumstances. The nature and scope of these regulations are well stated in the introductory portion which reads as follows:

> These rules cannot, nor are they expected to provide a solution to every question or problem which may arise in an organization established to render emergency service. It is expected, however, that they will be sufficiently comprehensive to cover either in a specific or general way, the obligations and duties of the members of the Albuquerque Fire Department. They are not designed, nor intended, to limit any member in the exercise of his judgment, or initiative in taking the action a reasonable person would take in extraordinary situations. Much, by necessity, must be left to the loyalty, integrity, and discretion of members. To the degree which the individual member demonstrates possession of these qualities in the conscientious discharge of his duty, and to that degree alone will the Department measure up to the high standard required of the service.

These regulations included unscheduled vacation, scheduled vacation, leave without pay and, most importantly, full or partial shift trading—a written agreement between two firemen to trade full or partial shifts—routinely approved in each instance by superior officers except when exigent circumstances intervened. These regulations were frequently availed of and were sufficient to permit attendance at weddings, baptisms, religious retreats, university classes and playing in a dance orchestra.

Zamora had sufficient seniority in 1971 to take a merit examination for promotion to the Fire Prevention Bureau of the Fire Department. He chose not to take it even though such promotion would have placed him in a position to avoid any Sabbath conflicts because no weekend work would have been required.

Between September 1971, when Zamora rejoined the Seventh Day Adventist Church, and his ultimate separation from service with the Albuquerque Fire Department in October 1972, Zamora sought ways to avoid working on his Sabbath when his work shift conflicted with it. On some occasions he reported for duty notwithstanding the conflict. On at least fourteen occasions he falsely claimed sick leave contrary to regulations and despite exposure to disciplinary action. In August 1972 a Friday-Saturday pattern was discovered with respect to Zamora's sick leaves by a high ranking superior officer, District Chief Lujan. When Lujan checked Zamora's whereabouts with respect to a Saturday sick leave and discovered he was at church Zamora was advised to produce a note from a physi-

---

* Of the Southern District of New York, sitting by designation.

cian for any future weekend sick leave. No disciplinary action was taken. In connection with another sick leave on September 23, 1972, Zamora produced a note from a physician who was a fellow church member to the effect that he had been "seen professionally." Zamora concededly was not really sick. On the occasion in August when Chief Lujan first inquired into Zamora's use of Friday-Saturday sick leave, Lujan visited with Zamora and his wife at Zamora's home and explained the various options Zamora could exercise with propriety in order to avoid any conflict with his Sabbath observance. Zamora took the position that he needed to be excused on all Saturdays and rejected the available options as insufficient. Thereupon Lujan referred him to the highest ranking officer, the Chief of the Fire Department, Ray Kuhn, a veteran fireman who had moved to his position over a period of thirty-two years of service. The meeting between Zamora and Kuhn, which took place in early September 1972 covered pretty much the same ground as that between Zamora and Lujan. Chief Kuhn discussed the entire problem and explained three methods of getting time off—trading of shifts, vacation leave and leave without pay. Zamora remained adamant and insisted, as he had with District Chief Lujan, that he be given the Sabbath time off on a firm basis and requested that he not be required to work the Friday night shift or the Saturday day shift. It should be noted, parenthetically, that even this implied a further relaxation with respect to two other shifts, the Friday day shift and the Saturday night shift, if they conflicted with the Friday or Saturday sundown requirement.[1] An uneasy peace ensued. Zamora requested and obtained unscheduled vacation leave for three shifts in September 1972 which conflicted with his Sabbath requirements. A further request by Zamora for unscheduled vacation leave for October 28, 1972, was denied because his district would be at minimum strength. Two firemen and a lieutenant who had made prior similar requests were refused for the same reason.

Although these men succeeded in obtaining the time off by trading shifts, Zamora did not seek to do so and indeed rejected a suggestion that he do so. In point of fact, Zamora traded shifts only once during his career as a fireman. He never pursued diligently the shift-trading method of avoiding conflicts. Zamora advised two superior officers, one of them District Chief Lujan, that he would not report for duty on October 28, 1972, because of his Sabbath observance. Zamora remained absent despite his awareness that he was placing himself in jeopardy of disciplinary action. His suspension followed. On October 29th District Chief Lujan went to Zamora's home to advise him he was being recommended for dismissal for insubordination in failing to report for duty as scheduled. On October 30, 1972, Zamora had a lengthy meeting with Chief Kuhn at which two religious advisers were present and again the regulations were discussed as a means of accommodating Zamora. Chief Kuhn offered to remove the suspension in an effort to persuade Zamora to avail himself of the available methods for obtaining time off. But Zamora remained adamant and refused to accept anything less than a firm commitment by the Fire Department that he would never be required to work on his Sabbath. Zamora's religious beliefs did not require such a commitment. He could have remained available for emergency work, and omitted only menial work, thus accomplishing one accommodation which he had on occasion been permitted to use in the past for part of a shift. Furthermore, he could have sought with greater diligence to use the methods available to him by regulation to avoid or attenuate the conflicts with his Sabbath.

The taking of an inflexible position by Zamora left those responsible for the operation of the Fire Department with a demand they could not meet. It could be likened to that of an Army Commander compelled to go to battle knowing that one or more of his soldiers would refuse to obey orders

---

1. Since the shifts change at 6:00 P.M., the Sabbath would conflict with the Saturday night shift in the summer and the Friday day shift in the winter.

during a given twenty-four hour period. Under such circumstances the Fire Department would be forsaking its heavy responsibilities fraught with serious risk to the life and property of the City's citizens as well as to its own personnel and equipment. It is impractical to suggest, as the Government appears to do in Zamora's behalf, that an exception should have been made for Zamora because he was one of many. In the highly sensitive area with which we are dealing, the presence or absence of one trained member in an emergency can mean the difference between the operation or non-operation of a piece of equipment and the difference between life and death. It is not fanciful to foresee a series of serious fires or other catastrophes with or without injuries to its personnel or epidemics of disease among the firemen which would compel the Fire Department to place its fire fighting personnel on an emergency footing requiring long hours of duty. In such situations the kind of commitment Zamora demanded would be utterly impossible of fulfillment.

Zamora's dismissal resulted from his adoption of an intransigent position. He was not dismissed because of his religious beliefs but because of his insubordination in failing to obey a direct order to report for work. Zamora's insubordination resulted from the Fire Department's failure to accommodate him on his own terms with respect to his Sabbath observance requirements. Zamora was not told by anyone in authority that his dismissal was ordered because of his religious beliefs. Zamora's testimony to the contrary is rejected by the Court as unpersuasive and inconsistent with the surrounding circumstances. In all their dealings with Zamora the officers of the Albuquerque Fire Department treated him fairly and considerately and with a compassionate regard for his religious beliefs.

Attempts were made by other city officials to find Zamora alternative employment with the city. These efforts proved unsuccessful. Zamora failed to meet with the City Personnel Director John Martinez, although personally requested to do so, and

possible job opportunities which might have suited Zamora were lost during the next six months because Zamora moved and remained unavailable.

In light of what has been said the Court cannot conclude that Zamora was dismissed, as he claims, because of his religious observance of the Sabbath. While religious considerations did constitute a basis for Zamora's motivations, there is ample evidence to support the conclusion that it was Zamora's intransigence and not his Sabbath observance which led to his dismissal. This threshold issue is not ruled upon as dispositive, however, since we are persuaded that the Albuquerque Fire Department attempted to make reasonable accommodations to Zamora's religious requirements; and further, that any further accommodations would have worked an undue hardship on the functions and business of the Fire Department. 42 U.S.C. § 2000e(j). We prefer to base our holding on these grounds.

The findings of fact and conclusions of law which follow are intended to amplify and supplement what has already been said, and to demonstrate that the case should be dismissed.

## FINDINGS OF FACT

1. This action was brought by the United States of America on behalf of Salomon Zamora, a fireman employed by the City of Albuquerque.

2. Defendant, City of Albuquerque, is a municipal corporation, incorporated under the laws of the State of New Mexico.

3. The Albuquerque Fire Department is operated by the City of Albuquerque to prevent and suppress fires within the city limits.

4. Ray Kuhn was Chief of the Albuquerque Fire Department from September 1, 1968, until his retirement, July 16, 1974.

5. Arthur Martinez became Chief of the Albuquerque Fire Department July 16, 1974, and was acting in that capacity at the time of the trial of this action, October 31–November 1, 1974.

6. Salomon Zamora was a member of the Seventh Day Adventist Church from 1961 until 1968. In the summer of 1968 he was divorced from his wife and disfellowshipped (involuntarily removed) from the Church.

7. In March 1969, Salomon Zamora was hired by the Albuquerque Fire Department as a fireman in the Fire Suppression Division.

8. Salomon Zamora remarried his former wife in September 1971, and rejoined the Seventh Day Adventist Church.

9. Salomon Zamora, since his remarriage, sincerely believes in the teachings of the Seventh Day Adventist Church.

10. The Sabbath is observed from sundown Friday to sundown Saturday by Seventh Day Adventists. Church members must refrain from all unnecessary work during the Sabbath. While unnecessary work can be defined as that which can be deferred to another time, the nature of such work escapes precise definition.

11. Emergency work, saving lives or property, and work necessary to prepare for emergency work may be done on the Sabbath.

12. During the period following his remarriage Salomon Zamora sincerely believed that he was violating his religious obligations by working as a fireman on the Sabbath with respect to the performance of work he considered to be of a non-emergency nature. He did not, however, avail himself of the options allowed by regulation to avoid conflict with his Sabbath observance.

13. The Albuquerque Fire Department is organized in two main divisions: Fire Prevention and Fire Suppression. Additionally, there are Administrative, Training, and Maintenance Divisions.

14. The Fire Prevention Bureau operates on an 8:00 a.m. to 5:00 p.m. schedule, Monday through Friday. It does not function on weekends.

15. A fireman first class with two years of seniority is eligible to take a merit examination for promotion to the Fire Prevention Bureau.

Salomon Zamora became eligible to take this examination on March 4, 1971. An examination for promotion to the Fire Prevention Bureau was given June 1, 1972, but Zamora did not elect to take it.

16. The Fire Suppression Division is maintained on a 24-hour 7-days a week schedule. Individual firemen work 56 hours a week. The day shift is 8:00 a.m. to 6:00 p.m. and the night shift is 6:00 p.m. to 8:00 a.m. Firemen are organized in three platoons, A, B, and C. The platoons work on a rotating schedule: three day shifts, three night shifts, and three days off. Rotation schedules are posted six months in advance.

17. No individual fireman is permanently assigned to a particular shift, or has specific days of the week off.

18. Within the Fire Suppression Division there are three Districts assigned to three corresponding geographical divisions of the City of Albuquerque. Each District is comprised of several engine and ladder companies.

19. Salomon Zamora was assigned to District One, Engine 10, during the time material to this action.

20. For each piece of equipment (such as a pumper truck or ladder truck), and for each District, there is an established minimum and maximum manning level.

21. Work schedules and manning requirements are set by the Fire Chief and the Rules Committee.

The Rules Committee is made up of one fireman from each of the six ranks: Assistant Chief, District Chief, Captain, Lieutenant, Driver, and Fireman.

22. The minimum manning level reflects in part the decisions of the Fire Chief as to the number of persons necessary to operate a piece of equipment safely and efficiently.

23. Department policy requires equipment below the minimum manning level to be held out of service until the minimum level is obtained.

24. When equipment is below minimum manning, an attempt is made to obtain a replacement from another station or by

having another employee (not scheduled on that shift) work overtime. Overtime work involves additional expenditure of public funds and is on a voluntary basis only.

25. While Zamora was with the Fire Department, there was no relief force available to fill vacancies caused by the unauthorized absence of firemen.

26. The maximum manning level is based on the total number of employees in the Albuquerque Fire Department as authorized by the City of Albuquerque.

27. The absentee rate in the Fire Suppression Division is about 12%, due to illness, vacation, or leave without pay.

28. The difference between the maximum and minimum levels is the number of individuals who would be allowed to be off on a given day.

29. The Albuquerque Fire Department Regulations provide that firemen may obtain time off in four ways: Scheduled vacations, unscheduled vacation, leave without pay, and shift-trading.

30. Salomon Zamora was accruing vacation time at a rate of one shift per month. This could be taken as scheduled or unscheduled vacation.

31. Scheduled vacation is allotted to firemen in January of each year on the basis of seniority within a given rank. Salomon Zamora competed for scheduled vacation with other firemen. A limited number of individuals of each rank are allowed to be on scheduled vacation at the same time.

32. Unscheduled vacation is requested as desired by individuals. Requests are granted on a first-come first-served basis without regard to rank.

33. An individual can also request leave without pay on any day except a holiday. Except in the case of an emergency, such requests are granted without regard to manpower requirements.

34. The Albuquerque Fire Department authorized shift-trading in 1971 to allow employees to obtain time off from scheduled work as they needed it.

35. Shift-trading involves an agreement between two individuals of the same rank to work each other's regularly scheduled shift on specified dates. Full or partial shifts may be traded.

36. Shift-trading involves only the individuals seeking to trade, with minimal supervision by the Fire Department administration.

37. Regulations require that: Shifts be repaid within 30 days; only 3 unpaid shifts may be accrued by an individual in one 30-day period, and a holiday shift may not be traded. A requested trade will be denied only if one of these conditions is not met.

38. In repaying a traded shift an individual might have to work 38 hours (night shift, day shift, night shift) or 34 hours (day shift, night shift, day shift) straight.

39. Shift-trading was unpopular with some individuals for this reason. Nevertheless it was availed of quite extensively by the firemen generally.

40. Zamora's Sabbath observance entailed the avoidance of all "unnecessary work" during the Sabbath period. While emergency work could be considered an exception to the "unnecessary work" rule, menial work could not. The distinction between the two is not readily ascertainable with respect to a fireman's duties and in the last analysis it appears to rest upon the conclusions of the individual church member.[2]

---

2. A duly ordained minister of the Seventh Day Adventist Church, Rev. Willmore Duncan Eva, testified as follows:

(p. 134)

Q Now, every briefly, if I give you a sketch of a hypothetical situation, would you tell me what the religious teaching of your church is concerning the Sabbath in this respect. Assume a fireman whose regular routine schedule of work involves him regularly in working on what has been defined as the Sabbath for the Seventh Day Adventist Church, what would the church's view of this kind of work be, this kind of conflict?

A Well, I think if a man were, had not yet been employed by the Fire Department, and

41. During 1971 and 1972 shift-trading was frequently used by firemen in Fire Suppression to obtain time off for various purposes such as attending school, playing in a band, or attending weddings, baptisms or religious retreats.

42. The Regulations governing methods for obtaining time off were explained to Salomon Zamora before his employment, during his training period and were reviewed during class sessions held regularly at each fire station.

was thinking of being employed by the Fire Department, we would probably urge, you know, that he didn't; that he find other employment if at all possible. But if he were already employed by the Fire Department, then became a Seventh Day Adventist or renewed his faith in the Adventist teaching, et cetera, that then he should try his best to work out the Sabbath situation, you know, with those involved.

This would be the basic position. We wouldn't, of course, want him to do any kind of unnecessary labor which could be deferred to another time on the Sabbath day. This would be the basic church thinking I suppose.

*    *    *    *    *    *
(pp. 135–136)

Well, you know, initially, what you try to do is not to do any work of any kind. In other words, get the whole of Saturday off from Friday sundown to Saturday evening sundown. If he can get that time off, completely free, this would be the ideal. And here again, and I guess this is the issue, really, here again the matter of individual conscience comes in, by all means, and there is some interpretation here that I suppose can look at, but the basic, principally the stand of the church is not to do any work that can be at all deferred to any other time.

Q   Would a partial accommodation be in order?

A   You mean such as just working some Saturdays?

Q   Or just doing some work on Saturdays and not other work involved in the firehouse routine?

A   Here again, if the person's individual conscience allowed him to do absolutely emergency work, I don't think that the church would take any strong action about it, by any means, but again it wouldn't be ideal for the church to do this or for him to do it in the church's views.

*    *    *    *    *    *
(p. 138)

Q   But if one of your parishioners decided that he would draw this distinction between emergency fire calls and menial household station duties, that would be all right with your teaching?

A   Here again, I would say again it wouldn't be an ideal and if he were already a member of the church, I don't think that he would be disfellowshipped from church membership, but we would certainly counsel him strongly

and urge him as we have already said, to get out of the Fire Department, if possible, or to take any recourse that he could to avoid any kind of work at all on Saturday, you know, in the Fire Department.

*    *    *    *    *    *
(pp. 139–140)

Q   Doctor, how do you define menial work?

A   This is always difficult, you know, to really come to a definition and ultimately, you have to take recourse in the man's own conscience, to what he sees to be menial work and what he sees to be emergency labor.

Q   Is it your precept that the man's conscience should determine what is menial and what is not menial?

A   No, sir, I think there are certain guidelines the church lays down.

Q   Let me give you a hypothetical question. Assume a fireman is stationed in a firehouse and is expecting at any moment to be called to a situation which may and very often does involve, risk to life and property and let us assume that in order to properly perform his duties, he needs to use certain equipment. The equipment requires a great deal of care for its preservation and maintenance. The care may consist of cleaning, wiping, polishing, greasing, oiling, lifting of heavy loads, the placing of heavy loads and so forth. Would you consider that work menial?

A   The work, now, this is my own opinion on this, the work, I don't know what the official position, if there is such a one in the church would be, but the work which involves preparing for an emergency or coming in from one emergency, checking the equipment so that you are in preparation for the next possible emergency, I would consider this emergency work also in my own conscience, but, now, Mr. Zamora may not feel exactly that way, and I think the church would give him all the leeway in the world to exercise his own interpretation of the basic principles of the Fourth Commandment, for example.

Q   Even though his judgment may be faulty, in your opinion, and may create danger for other persons' lives and property?

A   Well, I would think, you know, at this point that there ought to be some, I would certainly sit with him, in order to counsel with him on it, but if he really feels or believes in his own mind that his position is correct despite the counsel that I might attempt to give him, there's not really much that I can do to—

43. Fire Department Regulations are formulated by the Fire Chief and the Rules Committee, acting together.

44. The Sunday routine at the fire stations is more relaxed than on other days. The Training Division does not work on Saturday and Sunday so no classes are held. Buildings are not inspected. Business activity in the community is reduced. The Sunday routine is sometimes called "holiday routine."

45. In December 1971, Salomon Zamora began to use sick leave to avoid working when his scheduled shift conflicted with the Sabbath. This was contrary to the Fire Department Regulations and, to Zamora's knowledge, made him liable to disciplinary action. Salomon Zamora used sick leave for his Sabbath conflicts through August 1972.

46. No disciplinary action was taken against Zamora for his abuse of sick leave.

47. During the summer of 1972, when Zamora worked the Saturday evening shift and sundown came after 6:00, Zamora's station commander allowed Zamora to defer his "household duties" until after sundown. This accommodation was never refused Salomon Zamora when requested.

48. During December 1971 to August 1972 Zamora also used vacation leave three times and traded shifts once in order to have the Sabbath free.

49. District Chief Alfonso Lujan noticed in August 1972 that Zamora's sick leave frequently fell on Friday and Saturday. Chief Lujan visited Zamora's home on August 26, 1972, when he had reported sick, and found that Zamora was not sick and had attended church. Chief Lujan told Zamora that he would have to bring a note from a physician for any future sick leave on Friday or Saturday.

50. At this meeting Zamora explained to Chief Lujan that he needed to have his Sabbath off. Chief Lujan went over the four methods of obtaining time off under the regulations. He also mentioned the possibility of Zamora transferring to another job with the City or in the Fire Department such as Fire Prevention which would not conflict with the Sabbath. Zamora wanted a firm commitment that he could be off on all Sabbaths. Chief Lujan could not promise this. Lujan referred Zamora to Chief Kuhn, the highest ranking officer of the Fire Department.

51. Zamora did not make his need to have Sabbaths off known to his high ranking superiors until late August 1972. It appears likely that his immediate superiors were aware that some conflict existed and had sought to accommodate him before that time.

52. In early September, Chief Kuhn met with Salomon Zamora to discuss his problem. All the methods provided by the Regulations for obtaining time off were discussed in detail with Zamora. Chief Kuhn explained that he could not make the absolute guarantee requested by Salomon Zamora.

53. During September 1972 Zamora accommodated his conflicts using unscheduled vacation three times and once using sick leave.

54. Salomon Zamora requested, on October 9, 1972, unscheduled vacation for October 28, 1972. The request was denied because District 1 would be at minimum manning that day.

Other requests for unscheduled vacation on that date were also denied.

Zamora was informed of the denial on October 23, 1972.

55. The request was kept pending in case a change might allow it to be granted. At about 5:30 on October 27, 1972, Lt. John Milligan called Zamora and told him his request could not be granted.

56. Zamora then told District Chief Lujan he would not appear for work Saturday, October 28, 1972. Lujan asked Zamora to reconsider, but he would not. Lujan then ordered Salomon Zamora to report for work on October 28, 1972.

57. Zamora failed to report on October 28, 1972, and was logged as A.W.O.L. He was suspended by Chief Lujan who report-

ed to Chief Kuhn, recommending Zamora's dismissal.

58. Chief Kuhn met with Zamora and Seventh Day Adventist Pastors Hinkle and Laura concerning the suspension on October 30, 1972, when he again explained the four methods available to Zamora to obtain time off. Kuhn said that if Zamora would comply with the Fire Department Regulations, his suspension would be removed. Zamora again expressed his desire for an absolute guarantee of Sabbaths off. Zamora's testimony in this respect is as follows:

Q Were you asking Chief Lujan for a guarantee that you would be off on your Sabbath?

A Yes, sir, whenever I was scheduled to work on the Sabbath, that I would be allowed to be off on the Sabbath.

Q Regardless of manpower or manning restrictions, whatsoever is that correct?

A Yes, sir, I believe so.

59. At the October 30 meeting Zamora said that he found shift-trading difficult. He felt that he could not solve his problem working under the Regulations.

60. Salomon Zamora was dismissed for insubordination in refusing a direct order to report to work, and being A.W.O.L. (absent without leave).

61. Zamora met with Chief Kuhn again on October 31, 1972, when he turned in his City equipment. Chief Kuhn had plotted out Zamora's schedule for six months to determine the number of conflicts with the Sabbath. Chief Kuhn found that 14% of Zamora's scheduled full shifts conflicted over a full year. There were also 18 partial conflicts (of less than two hours each) since sundown does not always come at 6:00 when the shifts change. These partial conflicts could have been accommodated as they had on occasion in the past by a dispensation from "menial work" during the requisite brief period of time.

62. Chief Kuhn was justified in believing that Zamora could have arranged to have the Sabbath off by working within the Fire Department Regulations for time off.

63. Zamora requested and obtained a hearing before a Grievance Committee appointed by the City Personnel Director, pursuant to the City of Albuquerque Personnel Regulations.

64. The Committee formally recommended that an attempt be made to find Zamora a job with another City department. Zamora's dismissal was upheld.

65. Due principally to difficulties in communicating with him, and partly because of Zamora's employment history and limited skills, no other City employment could be offered to him.

66. Salomon Zamora filed a complaint with the EEOC on October 24, 1972, alleging that he was discriminated against by the Albuquerque Fire Department on account of his religion. The complaint was amended October 31, 1972, to include his discharge. This complaint was unjustified under the circumstances.

67. The EEOC found that an unfair employment practice had occurred apparently because of Zamora's unsupported *ex parte* conclusory statements.

68. On April 26, 1973, the EEOC District Director sent Zamora a letter stating that conciliation attempts had not been successful and that he could obtain a "notice of right to sue" upon request.

69. Suit was filed by the United States on November 15, 1973.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter in this case pursuant to 28 U.S.C. § 1345 and 42 U.S.C. § 2000e–5(f).

2. The Defendant City of Albuquerque is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. This action was timely filed although more than 180 days had elapsed since Zamora filed his charge with the EEOC. *E.E. O.C. v. Cleveland Mills Co.*, 502 F.2d 153 (4th Cir. 1974), *cert. denied*, 420 U.S. 946 (1975).

4. Title VII of the Civil Rights Act forbids an employer "to . . . discharge any individual . . . because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e–2(a)(1).

5. An employer is under an affirmative duty to provide reasonable accommodation to an employee's religious beliefs and observances unless it can show that an undue hardship to its business renders accommodation to the employee's objections unreasonable. 29 C.F.R. § 1605.1; 42 U.S.C. § 2000e(j).

6. Although an employer may not avoid the provisions of Title VII by giving the reason for discharge as insubordination when it is actually on account of the employee's religion, *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937 (M.D.Ala.1974), *compare Young v. Southwestern Savings and Loan Ass'n,* 509 F.2d 140 (5th Cir. 1975), this Court is not persuaded that the United States established a prima facie case of religious discrimination against Salomon Zamora. "Employment discrimination based on religion is a serious charge" (dissent of Thornberry, J. in *Young v. Southwestern Savings and Loan Ass'n, supra,* at p. 146) and should rest on a clearer and more persuasive basis than that offered by plaintiff here. The Court nevertheless prefers to avoid resting its decision upon this aspect of the case inasmuch as the Defendant Fire Department of the City of Albuquerque has convincingly demonstrated that it made reasonable efforts to accommodate Zamora, and that it could not do more without undue hardship to its operations.

7. Using the methods provided in the Fire Department regulations: vacation (scheduled and unscheduled), leave without pay, and shift-trading, Zamora could have arranged to be off on all Sabbaths he was scheduled to work except perhaps on those coinciding with holidays or with unusual and unforeseeable emergencies and those instances would appear to have been infrequent if they occurred at all.

8. These methods were carefully explained to Zamora on numerous occasions. They were known to Zamora when he obtained employment as a fireman with the Defendant Department and were reviewed with him by his superiors in an effort to cooperate with him and to accommodate his religious beliefs. Zamora never made full use of the available methods. Instead he confronted the Defendant Fire Department with a demand it could not meet—that it provide Zamora with a work schedule which would provide absolute assurance that no possible conflict with his Sabbath observance would ever arise.

9. Further accommodation, as suggested by the United States, would have imposed an undue hardship on the Albuquerque Fire Department in any of several ways: by inflicting an unjustified financial burden upon it; by compelling other firemen to accept less favorable working conditions; by forcing a reduction in the Defendant Department's fire fighting efficiency; by imposing onerous and complex scheduling problems upon it.

10. Salomon Zamora could have taken leave without pay on October 28, 1972, rather than remain A.W.O.L. He knew this, and chose not to take leave without pay. An accommodation is not unreasonable because an employee does not like it, or will not avail himself of it. The Albuquerque Fire Department was under no obligation to place Salomon Zamora on leave without pay status against his will.

11. There was no permanent shift to which Salomon Zamora could have been switched to avoid conflicts. The rotating shift feature of the Fire Department serves in part to distinguish other cases holding that employees were discharged unlawfully because of their religion: *Riley v. Bendix Corp.,* 464 F.2d 1113 (5th Cir. 1972); *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937 (M.D.Ala.1974); *Claybaugh v. Pacific Northwest Bell Telephone Co.,* 355 F.Supp. 1 (D.Ore.1973).

12. A blanket grant of Sabbaths off or substituting Sunday duty would still leave Zamora's scheduled Sabbath shift undermanned. An extra fireman might have been required either from another station,

possibly leaving that station short-handed, or from among firemen not scheduled for duty—causing someone to work overtime at premium wages and possibly requiring the replacement to work 38 or 34 hours straight. This situation is comparable to one which was found to create an undue hardship in *Hardison v. Trans World Airlines*, 375 F.Supp. 877 (W.D.Mo.1974). *See Johnson v. United States Postal Service*, 497 F.2d 128 (5th Cir. 1974). Title VII does not require an employer to impose hardships on its employees, or to bear the financial burden of an employee's religious convictions.

13. An employer is not required to make accommodations to the religious observances of its employees that will work an undue hardship on the conduct of its business. 42 U.S.C. § 2000e(j). One indication of whether such an accommodation can reasonably be made or whether it will work such a hardship is whether the employer has been or is now able or willing to make such accommodations for other employees similar to that which the Plaintiff demands. *Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972). The Fire Department of the City of Albuquerque has never allowed firemen to be absent from duty except by the regularly provided procedures, all of which were outlined and made available to Salomon Zamora from the outset of his employment. Defendant City of Albuquerque could not further accommodate Plaintiff's demands without imposing undue impediments to the fulfillment of its fire fighting function.

14. The serious public life-saving and property protecting nature of the Department's function and the strict manning and budgetary limits under which it operated prevented the Department from allowing the firemen time off upon demand or reshuffling schedules made up in advance on a six month basis in order to avoid scheduling one employee on Fridays and Saturdays, especially in a situation in which all employees are scheduled on a rotating three day shift. The case of *Hardison v. Trans World Airlines, supra*, suggests some of the limits

contemplated by the undue hardship language of the statute. In *Hardison* the Court held that a private employer, responsible for a passenger airline overhaul facility, was unable to accommodate the religious beliefs of an employee without undue hardship. The complainant, whose work schedule conflicted with his Sabbath observance, occupied a key position in defendant's overhaul facility and leaving that position empty would have impaired the operation of defendant's work, which in turn may have affected the safety of passengers flying in the defendant's airplanes. Filling the position from another area would have deprived that area of manpower, and calling up someone not regularly scheduled for work would have required the payment of premium overtime wages. These facts offer a close analogy with the situation of the Albuquerque Fire Department.

15. If the Albuquerque Fire Department falls below manning requirements, the obvious result is a greatly magnified risk to the citizens of the City of Albuquerque of loss of life and destruction of property, as well as an increased risk of harm to the firemen themselves. The cost of accommodating any vacancies in the established work schedule must be met from public funds. Therefore, any further accommodation by the Fire Department to Salomon Zamora's demands would have been in excess of the accommodation contemplated by Congress and would have constituted an undue hardship.

16. The Court cannot impose serious restrictions upon the operation of a business where the lives and property of citizens may be at stake. See *Harper v. Mayor and City Council of Baltimore*, 359 F.Supp. 1187, 1205 (D.Md.1973).

17. Since a reasonable accommodation to his religious beliefs was made by the City under the Fire Department Regulations, and since any further accommodation would have caused undue hardship to the business of the Fire Department, Salomon Zamora was not discharged because of his religion as defined in 42 U.S.C. § 2000e(j). Zamo-

ra's discharge was not in violation of Title VII, Civil Rights Act of 1964, as amended.

Accordingly, the complaint is dismissed with prejudice.

It is so ordered.